

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**United States Bankruptcy Judge**

**Signed July 03, 2012**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Case No. 09-34269-SGJ-7 |
| BASE HOLDINGS, LLC, | § | Chapter 7 |
| | § | |
| Debtor. | § | |
| CENTER OPERATING COMPANY, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 09-03256-SGJ |
| | § | |
| BASE HOLDINGS, LLC, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER ADDRESSING CROSS-MOTIONS
FOR SUMMARY JUDGMENT ON DEFENDANT'S COUNTERCLAIMS, SPECIFICALLY:
(A) GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON ALL
COUNTERCLAIMS, EXCEPT ONE BREACH OF CONTRACT CLAIM; AND (B)
DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

I.    INTRODUCTION.

The above-referenced adversary proceeding ("Adversary

1

Proceeding") is, essentially, a landlord-tenant dispute that erupted within a bankruptcy case. The Plaintiff, Center Operating Company, L.P. (the "Plaintiff" or "Landlord-Center"), is the landlord. Landlord-Center is the operator of a sports and special events complex near downtown Dallas, Texas that is known as American Airlines Center—the hallowed ground at which the Dallas Mavericks NBA basketball team and the Dallas Stars NHL hockey team each play (the "Arena"). The Arena anchors a larger development in Dallas known as Victory Park. The tenant in this landlord-tenant dispute is Base Holdings, LLC, which was a franchisee of the well-known restaurant corporation Brinker International, and was the operator of a Chili's Bar & Grill restaurant (the "Restaurant") at the southwest corner of the Arena. The Restaurant, unfortunately, had a short and unsuccessful life span. It operated for a mere nine months, starting in late 2008, before voluntarily seeking Chapter 11 bankruptcy relief, and then ultimately (and abruptly) closing. In fact, the tenant ("Debtor" or "Tenant-Base" of "Defendant") moved to convert its Chapter 11 reorganization case to a Chapter 7 liquidation case, soon after the bankruptcy case and this Adversary Proceeding were filed; thus, the Chapter 7 Trustee, Robert Yaquinto (the "Bankruptcy Trustee"), is now the party-defendant in this Adversary Proceeding and stands in the shoes of the tenant—although many of the pleadings still refer to "Base

Holdings, LLC"[1] as the Defendant.[2]

Soon after Tenant-Base filed its bankruptcy case (which was on July 6, 2009), the Landlord-Center commenced this Adversary Proceeding (on August 7, 2009), by filing a Complaint for Declaratory Judgment, which requested that the bankruptcy court declare the parties' rights under their June 2, 2008 Lease Agreement (herein so called). Specifically, the Complaint asserted that Tenant-Base had never paid any rent at all to Landlord-Center, and Landlord-Center sought a determination as to how the defined term "Chili's Opening Date" should be interpreted in the Lease Agreement, for purposes of calculating all rent due to Landlord-Center. The Complaint also asked for certain other declarations regarding the parties' rights, status, and legal relations pursuant to the Lease Agreement. ***Landlord-Center also filed a proof of claim in the underlying bankruptcy case in the***

---

[1] Apparently Base Holdings, LLC was initially formed to develop a restaurant business (utilizing the Chili's concept, where possible) on **military bases,** and it even had contracts with the United States Navy and United States Army at one time. Apparently, any and all military contract rights and opportunities were transferred to a different entity, shortly before the bankruptcy filing. Plaintiff MSJ App. 898. The court assumes that the Bankruptcy Trustee has been or will be fully investigating this. In any event, this explains the unusual name "Base Holdings, LLC."

[2] *See* Order Granting Trustee's Motion to Realign Parties, dated August 17, 2011. DE # 89.

Note that references to "DE # __" throughout this Memorandum Opinion and Order refer to the record entry number at which a particular pleading appears in the docket maintained by the Bankruptcy Clerk for this Adversary Proceeding.

**amount of $1,595,918.83, for various amounts allegedly due to it under the Lease Agreement**. *See* Claim No. 7, in the Claims Register maintained in Case No. 09-34269. Note that Tenant-Base was still occupying its Restaurant-space in the Arena at the time that this Adversary Proceeding was commenced (thus, it still had all of its rights and remedies available to it pursuant to Section 365 of the Bankruptcy Code).[3]

The Adversary Proceeding quickly grew more complicated. The Debtor, Tenant-Base, vacated its space in the Arena less than a month after the Adversary Proceeding was filed, and thereafter filed an answer in this Adversary Proceeding that also asserted numerous **counterclaims** against Landlord-Center, including numerous torts (mostly fraud claims) and breach of contract. Tenant-Base also filed a **separate** adversary proceeding against Landlord-Center, asking the bankruptcy court to avoid Landlord-Center's statutory landlord lien that it was asserting ("Lien Avoidance Adversary Proceeding"). A motion to consolidate the Lien Avoidance Adversary Proceeding with this Adversary Proceeding was filed by Landlord-Center, but the parties later reached an Agreed Judgment of Dismissal in the Lien Avoidance Adversary Proceeding. Additionally, insiders of the Tenant-Base (specifically: its equity owner, Gilbert Aranza, and certain of

---

[3] Such as the right to reject, assume, or assume and assign the Lease Agreement (with the latter two options requiring, among other things, a curing of defaults).

4

his affiliates) filed a state court lawsuit against Landlord-Center, alleging the same type of claims as the Debtor alleged (as counterclaims) in this Adversary Proceeding.  The bankruptcy court stayed this latter lawsuit, determining that insiders were essentially exercising control over claims that were property of the bankruptcy estate.

Many months have now elapsed in the Adversary Proceeding. During these months, not only did Base-Tenant vacate the Restaurant space (which was followed by various legal skirmishes regarding personal property at the Restaurant), but, as mentioned, a Bankruptcy Trustee was appointed for Tenant-Base. Then, a motion to dismiss counterclaims was heard and decided (on July 20, 2010)—with the bankruptcy court dismissing three of Tenant-Base's many counterclaims.  Additionally, a jury demand was made by Tenant-Base (which was objected to by Landlord-Center and stricken by the bankruptcy court, on August 18, 2010).[4]

---

[4] In ruling on the Debtor's jury demand, this court was guided by the Fifth Circuit decision in *In re Jensen,* 946 F.2d 369 (5th Cir. 1991), *abrogated on other grounds by In re Conn. Nat'l Bank v. Germain*, 503 U.S. 249 (1992).  In *Jensen*, the Fifth Circuit considered the question of whether a debtor effectively subjects his prepetition claims to the bankruptcy court's equitable power (and loses his right to a jury trial he might otherwise have) when he files a petition for bankruptcy. The Fifth Circuit concluded that a debtor does not.  The Fifth Circuit elaborated that, in *Jensen*, as in the landmark *Granfinanciera* case, the debtors' claims (which were against third-party defendants who had not filed proofs of claim) did not "arise as part of the process of allowance and disallowance of claims."  *Jensen*, 946 F.2d at 373; *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 58-59 (1989). Nor were the Jensens' claims  "integral to the restructuring of debtor-creditor relations." *Jensen, 946 F.2d at 374 (citing Granfinanciera)*. Rather they were essentially claims brought by the

In mid-2011, cross motions for summary judgment, responses, and supporting documentary evidence were filed—**_solely dealing with Tenant-Base's (i.e., the estate's) numerous, remaining counterclaims against Landlord-Center._**[5] Landlord-Center moved

---

debtor-in-possession in a state court against non-creditor third parties to augment the bankruptcy estate (note that it was the defendants that had removed the action to bankruptcy court). The Fifth Circuit reconciled its holding with a similar but distinguishable case from the Seventh Circuit, *In re Hallahan,* 936 F.2d 1496 (7th Cir.1991). In *Hallahan,* the debtor petitioned for bankruptcy while he was a defendant in a suit then pending against him in federal district court. The bankruptcy petition triggered the automatic stay, 11 U.S.C. § 362, and the plaintiff filed a proof of claim and complaint of dischargeability in the bankruptcy court. The court denied the debtor's request for a jury trial. The Seventh Circuit affirmed, deciding that a dischargeability proceeding is a type of equitable claim for which there is no jury right in the first place. The Fifth Circuit stated that it agreed with the **result** in *Hallahan,* but not the Seventh Circuit's **reasoning** with regard to **why** the debtor had no right to a jury trial. *Jensen,* 946 F.2d at 374. The Fifth Circuit stated that it believed the debtor in *Hallahan* was not entitled to a jury trial, not because the debtor had filed a petition in bankruptcy, but because the **_plaintiff in the action had submitted his claim against the debtor to the equitable jurisdiction of the bankruptcy court_**. *Id.* The Fifth Circuit stated that filing a proof of claim denied **both** the plaintiff and the defendant, debtor, any right to jury trial that they otherwise might have had on that claim. *Id.*

In summary, this bankruptcy court believed that Debtor/Tenant-Base had no jury trial right (under the holding of *Jensen*) since its counterclaims were **_against a plaintiff that had submitted its claims against the Debtor to the equitable jurisdiction of the bankruptcy court_** and **_because the overall dispute (claims and counterclaims) were part of the process of claims allowance and disallowance._**

[5] Specifically, the court refers to: (1) the Motion for Summary Judgment and Brief in Support [DE ## 77 & 78] (the "Plaintiff's MSJ"), filed by Landlord-Center; the Response thereto and Brief in Support [DE ## 90 & 91], filed by the Defendant, Tenant-Base; the Reply thereto [DE # 100] of the Plaintiff; (2) the Defendant's Motion for Partial Summary Judgment and Brief in Support [DE ## 84 & 85] (the "Defendant's Partial MSJ"); the Response thereto and Brief in Support of the Plaintiff [DE ## 94 & 95]; the Reply thereto [DE # 98] of the Defendant; and (3) all summary judgment evidence/appendices submitted with such pleadings [DE ## 79, 80, 86, 91 & 96].

for summary judgment on **all** of the counterclaims asserted on behalf of the estate of Tenant-Base (*i.e.,* all of the counterclaims that had not been dismissed by the bankruptcy court earlier). Tenant-Base moved for summary judgment on two of its counterclaims. The bankruptcy court took those cross-motions for summary judgment under advisement (in Fall of 2011) after oral arguments. Around the time that this bankruptcy court was prepared to issue a written ruling on the cross-motions for summary judgment, Tenant-Base filed (on December 21, 2011) a motion to withdraw the reference and motion for remand. Tenant-Base argued that, pursuant to the holding in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), the bankruptcy court had no Constitutional authority to render a final judgment on the counterclaims of the estate (hereinafter, the "*Stern* Motion"). DE ## 112 & 113 (same pleading). The *Stern* Motion was filed a

---

The court herein refers to the summary judgment evidence contained in the Appendix to Plaintiff's MSJ as "Plaintiff MSJ App. __" with the applicable page numbers used whenever there is a "___." Similarly, the court refers to the Appendix to Defendant's Response as "Defendant Resp. App. __."

The court refers to the summary judgment evidence contained in the Appendix to Defendant's Partial MSJ as "Defendant Partial MSJ App. " with the applicable page numbers used whenever there is a " ." Similarly, the court refers to the Appendix to Plaintiff's Response as "Plaintiff Resp. App. ."

Note, that in determining the merits of the Plaintiff's MSJ and the Defendant's Partial MSJ, the court also has discretion to take judicial notice of all documents filed with this court in the Action. *See Goldberg v. Craig (In re Hydro-Action, Inc.)*, 341 B.R. 186, 188 (Bankr. E.D. Tex. 2006) (citing Fed. R. Evid. 201(b), (f)).

full six months after the Supreme Court's ruling in *Stern v. Marshall*, approximately five months after the cross-motions for summary judgment were filed, and 28-and-a-half months after the Adversary Proceeding was filed.

The bankruptcy court held a status conference on February 6, 2012, on Tenant-Base's motion to withdraw the reference and motion for remand. Counsel for Base-Tenant announced that it was withdrawing its request for remand and was simply urging withdrawal of the reference. Based on the arguments made at the status conference, the bankruptcy court has issued a Report and Recommendation to the District Court,[6] respectfully recommending that the District Court **deny** the *Stern* Motion, and **not** withdraw the reference, based on the reasons that:

> (a) the counterclaims in this Adversary Proceeding are distinguishable from those in *Stern v. Marshall*, in that it seems **necessary** to resolve the counterclaims as part of the proof of claim allowance or disallowance process (*i.e.,* here, unlike in *Stern v. Marshall*, the plaintiff against whom the counterclaims are asserted still has a live, unresolved proof of claim that will not survive if the counterclaims are sustained);[7] and

---

[6] The bankruptcy court has issued such Report and Recommendation simultaneously with this Memorandum Opinion and Order.

[7] This court duly notes that the dissenters in *Stern v. Marshall* discussed a hypothetical scenario in which a tenant files a bankruptcy case and wishes to assert counterclaims in defense to a landlord's proof of claim for unpaid rent, and—under their interpretation of the majority opinion in *Stern*—such a debtor-tenant would have to go to the federal district judge, not the bankruptcy judge, to have the counterclaims resolved. *Stern*, 131 S. Ct. at 2630 (dissent). The dissenters suggested that this would be an unfortunate "constitutionally required game of jurisdictional ping-pong" and would

(b) Debtor/Tenant-Base should be deemed to have **consented** to the bankruptcy court finally adjudicating this Adversary Proceeding: (i) by, first, filing the counterclaims in the bankruptcy court (which were amended twice in a seven-month period)[8], (ii) by filing a motion for summary judgment and signing a pretrial order—both **after** *Stern v. Marshall*—never mentioning that Tenant-Base would challenge adjudication of its counterclaims in the bankruptcy court, and (c) delaying filing a motion to withdraw the reference for more than two years (and more than six months after *Stern v. Marshall*).

In the alternative, the Report and Recommendation suggests that, if the District Court determines that the bankruptcy court has no Constitutional authority to enter final orders on the counterclaims, the District Court should:

---

lead to inefficiency. *Id.* If the dissenters were correctly interpreting the majority's ruling in *Stern* (and this Article I judge loathes to suggest otherwise) then this bankruptcy court may be erring in finding that the facts in this Adversary Proceeding are distinguishable from *Stern*. However, the majority in Stern stressed that the "question is whether the action [the estate's counterclaim or other affirmative request for relief] stems from the bankruptcy itself **or would necessarily be resolved in the claims allowance process**." *Id.* at 2618. This bankruptcy court fails to see how it can possibly resolve Landlord-Center's $1.5 million, contractually-based proof of claim and request for declaratory relief without deciding the arguments made by Debtor in asserting its counterclaims (Tenant-Base argues everything from breach of the lease to fraud in the inducement claims against Landlord-Center). This seems distinguishable from the situation in *Stern* where:  (a) the stepson's/plaintiff's tort claims made in the bankruptcy court **had already been disallowed prior to a trial on the debtor's counterclaims**; and (b) the stepson (as a then-claimless counter-defendant), not the Debtor who sought bankruptcy protection, was the one challenging the bankruptcy court's Constitutional authority to adjudicate the dispute.

[8]   In its original Answer and Counterclaims [DE #5, filed 9/18/09], First Amended Answer and Counterclaims [DE # 13, filed 10/23/09], and Second Amended Answer and Counterclaims [DE # 39, filed 4/22/10], Tenant-Base admitted "that the Court [bankruptcy court] has non-exclusive jurisdiction" over the lease dispute. *See* ¶¶ 3, 37 & 52 of each pleading.

(a) consider this Memorandum Opinion and Order on the Cross-Motions for Summary Judgment as a **proposed** ruling;

(b) **adopt** the Memorandum Opinion and Order and **enter it as an Order of the District Court**; and

(c) deny actual withdrawal of the reference but, instead, refer all remaining matters in this Adversary Proceeding to the bankruptcy court to conduct, with the proviso that the bankruptcy court shall make **proposed** findings of fact and conclusions of law thereon to the District Court for the District Court to consider *de novo* pursuant to 28 U.S.C. § 157(c)(1).

Based on all the foregoing, and further based upon the summary judgment record and arguments presented, the court is: (a) denying, in full, Defendant's Partial MSJ; (b) granting Plaintiff's MSJ on all of Tenant-Base's tort counterclaims; (c) granting Plaintiff's MSJ on all but one of Tenant-Base's breach of contract claims (*i.e.,* the one breach of contract claim of Tenant-Base that should survive is one alleging that Landlord-Center improperly charged rent before December 6, 2008). Due to genuine issues of disputed fact, a trial on the merits is needed on this one remaining breach-of-contract counterclaim. A trial on the merits is likewise needed on the Landlord-Center's proof of claim and its requests for declaratory judgment. This Memorandum Opinion and Order is issued pursuant to Federal Rule of Bankruptcy Procedure 7056.

## II.   JURISDICTION AND COURT AUTHORITY.

Bankruptcy subject matter jurisdiction exists in this

Adversary Proceeding, pursuant to 28 U.S.C. § 1334(b). This bankruptcy court has authority to exercise bankruptcy subject matter jurisdiction, pursuant to 28 U.S.C. § 157(a) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984.

Additionally, at least *statutory* "core" matters are involved in this Adversary Proceeding, pursuant to 28 U.S.C. § 157(b)(2)(B) and (C). This Adversary Proceeding, as explained above, essentially involves a landlord's proof of claim; requests for declarations by the landlord regarding its lease with the debtor; and counterclaims by the bankruptcy estate back against the landlord. These are squarely "core" matters, pursuant to 28 U.S.C. § 157(b)(2)(B) and (C). However, 28 U.S.C. § 157(b)(2)(C) was recently declared unconstitutional by the Supreme Court, at least as it applied to the facts in *Stern v. Marshall*. As explained above (and also in the Report and Recommendation to the District Court issued this same date), notwithstanding the holding of *Stern v. Marshall*, the bankruptcy court believes that it has Constitutional authority to issue final orders or judgments in this Adversary Proceeding; moreover, the court believes that the parties have provided necessary consent for the bankruptcy court to enter final orders in this Adversary Proceeding. However, in the event this bankruptcy court is found

11

to lack Constitutional authority to enter this Memorandum Opinion and Order, this court submits this as a proposed ruling to the District Court.

### III. PROCEDURAL POSTURE.

As referenced above, on August 7, 2009, Landlord-Center initiated this Adversary Proceeding, through the filing of its Complaint for Declaratory Judgment (the "Complaint") against Tenant-Base. The facts of this Adversary Proceeding revolve around Tenant-Base's failed Restaurant that was opened in late 2008. The disputes arise out of the Lease Agreement that was executed by Tenant-Base, as tenant, and Landlord-Center, as the landlord, on or about June 2, 2008 (the "Lease" or sometimes the "Lease Agreement"). In the Complaint, Landlord-Center seeks a declaratory judgment, requesting the court to declare Landlord-Center's and Tenant-Base's rights under the terms of the Lease.

On April 22, 2010, Tenant-Base filed its Second Amended Answer to the Complaint and Counterclaims (the "Counterclaims"), asserting various claims against Landlord-Center, including: (1) statutory fraud under the Texas Business & Commerce Code § 27.01(a); (2) statutory fraud under the Texas Business and Commerce Code § 27.01(a)(2); (3) common law fraud in the inducement by affirmative representation; (4) common law fraud in the inducement by non-disclosure; (5) common law fraud; (6) "string along fraud"; (7) negligent misrepresentation; (8) breach

of contract regarding the Lease; (9) breach of warranty of quiet enjoyment; (10) breach of warranty of suitability; (11) unjust enrichment; and (12) attorney's fees.  In an Order entered on July 20, 2010, the bankruptcy court dismissed three of Tenant-Base's twelve counterclaims:  those for breach of warranty of quiet enjoyment; breach of warranty of suitability; and unjust enrichment (the "MD Order") [DE # 61].  Thus, all that remains of Tenant-Base's counterclaims are the various fraud claims, the negligent misrepresentation claim, the breach of Lease claims, and the attorney's fees claim.

> A.   **The Tort Claims:  Landlord-Center's Alleged Misrepresentations Regarding Parking.**

As to Defendant's fraud and negligent misrepresentation claims, these claims revolve around certain statements made by Mr. Joe Skendarian ("Skendarian"), a representative for Landlord-Center, prior to the Lease being executed, in which Skendarian represented that, once he obtained a signed Lease from Tenant-Base, he would obtain the signatures on the various attachments, compile the exhibits (which **importantly** included a parking agreement for Lot E of the Arena (the "Parking Agreement")), and send out a complete Lease package.  Tenant-Base argues that the Parking Agreement was vital to the success of the Restaurant, and that the lack of a Parking Agreement ultimately caused the business to fail by September 2009, approximately 10 months after the Restaurant originally opened.  Tenant-Base argues that

Landlord-Center's failure to deliver the Parking Agreement caused it to lose its total investment in the Restaurant of $3,000,000, as well as the profits which it reasonably expected to receive over the life of the Lease.

> **B.  The Breach of Contract Claims:  Landlord-Center's Failure to Deliver Parking; Alleged Interference with Advertising; Access; and Premature Charging of Rent**

As to Tenant-Base's breach of Lease claim, Tenant-Base not only argues that Landlord-Center materially breached the Lease by not providing the Parking Agreement, but also that Landlord-Center breached the Lease by: (1) refusing to allow Tenant-Base to advertise and pass out handbills and coupons inside the Arena during the circus and a women of faith event; (2) impeding the access of customers to the Restaurant by barricading an entry way located immediately next to the Restaurant during the circus; and (3) charging for rent prior to the Lease commencing, which Tenant-Base alleges was on December 6, 2008.  Tenant-Base also asserts that, due to Landlord-Center's breach, Tenant-Base has lost its total investment in the Restaurant of approximately $3,000,000 and the profits which it reasonably expected to receive over the life of the Lease.

For the reasons set forth below, the court holds that: (a) Tenant-Base should be denied summary judgment on its Counterclaims; (b) Landlord-Center should be granted summary judgment on all of Tenant-Base's tort counterclaims; and (c)

14

Landlord-Center should be granted summary judgment on all but one
of Tenant-Base's breach of contract claims (as hereinafter
described).  Due to genuine issues of disputed fact, a trial on
the merits is needed on this one remaining breach-of-contract
counterclaim, as well as on Landlord-Center's proof of claim and
its requests for declaratory judgment.

**IV. UNDISPUTED MATERIAL FACTS.**

   ***A.   The Negotiation of the Lease and the Parking Agreement***

   1.   The Lease that is the subject of this Adversary
Proceeding was for more than 3,000 square feet of space located
at the southwest corner of the Arena.  *See* Plaintiff MSJ App. 23,
26.  With regard to parking arrangements, Section 3a of Exhibit C
to the Lease is germane and it provides, in part, as follows:

> During ***Non-Event Dates***, Landlord shall provide parking
> for Tenant's Customers ***in Parking Lot E*** near the
> Premises, pursuant to the Proposal Regarding COC Retail
> Parking Easement between Anland North Commercial, L.P.
> and Anland North II and Landlord attached hereto as
> Appendix "1" including spaces for Handicap Parking . . .
> . If parking Lot E becomes unavailable due to relocation
> by the owner of such lot, Landlord shall provide the same
> number and designation of spaces in a lot as close in
> proximity to the original designated spaces as reasonably
> practical.

*See* Plaintiff MSJ App. 54 (emphasis added).  "Non-Event Dates"
are defined in Section 1 of Exhibit C to the Lease and are "those
dates when the arena portion of the Center is not open to the
public or other large groups of people for sporting,
entertainment, or other public events."  *See* Plaintiff MSJ App.

15

53.  "Event Dates" means those dates when the arena portion of the Center is open to the public or other large groups of people for sporting, entertainment, or other public events." *Id*. Section 3b of Exhibit C of the Lease provides that "[d]uring Event Dates, Landlord is **not** required to provide parking for Tenants' Customers." *See* Plaintiff MSJ App. 54 (emphasis added). At the time the parties executed the Lease, ***Appendix 1 [i.e., the Parking Agreement] was not attached to the Lease***. *See* Plaintiff MSJ App. 2.

2.  The Lease and the specific provision referenced above were the product of an earlier letter of intent (the "Letter of Intent") signed by Gilbert Aranza ("Aranza"), on behalf of Aranza Services Corporation ("ASC"), and Skenderian, on behalf of Landlord-Center, on or about March 7, 2007, over a year prior to the actual Lease being executed.[9]  Aranza (as well as Skenderian) can fairly be characterized as sophisticated, in that Aranza has more than 20 years of experience in the restaurant industry and practiced law for approximately 15 years prior to that.  *See* Plaintiff MSJ App. 674-75.  Aranza also owns and/or operates numerous restaurants and businesses including spaces at DFW Airport and Dallas Love Field Airport.  *See* Plaintiff MSJ App. 674.  Skenderian, who is a Vice President of Landlord-Center,

---

[9] *See* Plaintiff MSJ App. 65-67.  When the Lease was signed, Tenant-Base was ultimately substituted in for ASC as the "Tenant".

served as the liaison between Tenant-Base and Landlord-Center
regarding the negotiation of the Lease. *See* Defendant Resp. App.
114.

3.   The Letter of Intent negotiated between Aranza and
Skenderian set forth the proposed terms of a potential lease
agreement between ASC and Center for approximately 4,200 square
feet of space in the Arena for the establishment of a Chili's Bar
and Grill Restaurant. *See* Plaintiff MSJ App. 65-67.  The Letter
of Intent importantly acknowledged that adequate parking spaces
were necessary for the Restaurant to be successful. *Id.*

4.   At the time the Letter of Intent was executed, Landlord-
Center controlled, and still controls, the Platinum Garage that
is near the northeast corner of the Arena, which contains
approximately 2,000 parking spaces, and the underground garage
that is commonly referred to as the Gold Garage, which lies
beneath the plaza just south of the Arena; however, Hillwood
Development Company and/or its affiliated entities (including
Anland North Commercial, L.P. and Anland North II, L.P.)
(collectively, "Hillwood") actually owned the various surface
parking lots located around the Arena, including Lot E, located
on the northwest corner of the Arena (*i.e.,* the lot that
Landlord-Center ultimately was obligated to make available for
the Restaurant, pursuant to the Lease Agreement), and Lot A
located on the southwest corner of the Arena (*i.e.,* the lot that

17

was closest to the Restaurant). *See* Plaintiff MSJ App. 3,
Plaintiff Resp. App. 39 & Defendant Resp. App. 86-89.

5. Shortly after the parties entered into the Letter of
Intent, Craig Courson ("Courson"), who was and remains an
Executive Vice President and Chief Financial Officer of Landlord-
Center, began negotiating with Hillwood on the terms of a parking
agreement that would provide parking spaces in Lot E for the
Restaurant. *See* Plaintiff MSJ App. 4. Courson handled the
majority of the negotiations and communications with Hillwood
regarding the parking issues and dealt almost exclusively with
Mike Craver ("Craver"), who was formerly Associate General
Counsel at Hillwood.[10] *See* Plaintiff MSJ App. 4.

6. Courson and Craver engaged in negotiations and
exchanged various emails and drafts of an agreement for parking
in Lot E for the Restaurant during 2007 and early 2008. *See*
Plaintiff MSJ App. 4-7, 74-112, 114-143. However, by the time
Tenant-Base and Landlord-Center signed the Lease on June 2, 2008,
Hillwood and Landlord-Center had not yet signed the Parking
Agreement that was referenced above in Section 3a of Exhibit C to
the Lease. *See* Defendant Resp. App. 178.

---

[10] Courson also received emails attaching drafts of a potential
parking agreement from time to time from Clay Pulliam and Kathy
Cannon, who were also working at Hillwood. *See* Plaintiff MSJ App. 4.

**B.   Landlord-Center's Continued Negotiations with Hillwood Regarding the Parking Agreement**

7.   Although there was not a signed Parking Agreement by the time the Lease was executed, neither Craver nor anyone else at Hillwood ever communicated to Courson that Hillwood would not eventually sign the Parking Agreement for Lot E.   *See* Plaintiff Resp. App. 47-48.   In fact, Craver (who has moved out of state and no longer works in-house for Hillwood) even testified in a deposition that it was safe to say that, as of June 8, 2007, Hillwood and Landlord-Center had at least, a preliminary agreement regarding the Parking Agreement for the Restaurant. *See* Plaintiff Resp. App. 40.   Moreover, as of late October 2007, Courson believed he had reached an agreement on all the material terms of the Parking Agreement with Hillwood regarding the provision of 50 spaces for Lot E.   *See* Plaintiff MSJ App. 6-7, 136-144 & Plaintiff Resp. App. 42-43.

8.   In March and April of 2008, Courson and representatives of Hillwood (along with counsel for Landlord-Center's lenders)[11] exchanged various emails and drafts of an agreement regarding the formal easement document regarding parking for the Restaurant in Lot E, which agreement contained the same terms as what Courson and Craver had previously agreed upon in October 2007.   *See*

---

[11] Landlord-Center was required to get formal lender-approval for certain transactions including signature of the Lease Agreement as well as entering into the Parking Agreement.   *See* Plaintiff MSJ App. 9, 253-375.

Plaintiff MSJ App. 9-10, 376-509.

9.   Days after the Lease Agreement was signed, Craver then communicated to Courson for the first time that Hillwood's execution of the Parking Agreement for Lot E was tied to the parties executing a larger parking agreement between Landlord-Center and Hillwood referred to as the "Sixth Amendment." Plaintiff Resp. App. 46, 162.

10.   Subsequent to this communication, Courson continued to make efforts to get the Parking Agreement finalized and signed. *See* Plaintiff MSJ App. 11-20, 510, 514-515, 517-563.   Moreover, Craver even testified that, in his mind, none of the additional negotiations that took place after the Lease Agreement was signed had anything to do with the Parking Agreement, since those material terms had already been agreed upon.   *See* Plaintiff Resp. App. 46-48, 163.   Rather, the negotiations had mainly to do with the Sixth Amendment, and Craver appeared to focus his efforts to get that agreement finalized, so that he could get the necessary Hillwood signatures for the Parking Agreement.   *Id.* at 48-49, 62-64.

**C.   *The Completion of Construction and Opening of the Restaurant***

11.   At the time that Tenant-Base and Landlord-Center entered into the Lease Agreement, they had projected that the Restaurant would be open by approximately October 1, 2008.   *See* Plaintiff MSJ App. 24.   However, subsequent to signing the Lease

Agreement there were delays in both the permitting for and
construction of the Restaurant.

12.   Pursuant to the terms of the Lease, Tenant-Base agreed
that it would be responsible for the construction of the tenant
improvements and interior finish out of the Restaurant.  *See*
Plaintiff MSJ App. 27 (Section 2.2), 30 (Section 5.1), 33
(Section 7.4).  Tenant-Base also agreed under the terms of the
Lease, that it would be responsible for procuring and maintaining
at its expense the necessary permits to construct and open the
Restaurant.  *Id.* at 33 (Section 7.4).

13.   On May 27, 2008, Tenant-Base obtained a demolition
permit for the demolition to be done for the construction of the
Restaurant.  *See* DE # 92, Statement of Stipulated Facts.  On July
22, 2008, Tenant-Base obtained a building permit for the
construction of the interior portion of the Restaurant.  *Id.*
However, Tenant-Base was unable to obtain a building permit for
the construction of the exterior portion of the Restaurant,
including the construction of a covered patio, because such
permit required that the Victory Planned Development District, PD
582 (the "PD") be amended.[12]  *See* Defendant Resp. App. 156-57.
Tenant-Base was not responsible for procuring the PD amendment,

---

[12] Prior to the Lease being signed, Landlord-Center did undertake
an analysis to determine whether the PD would need to be amended and
determined that the addition of the patio would not require an
amendment to the PD.  *See* Defendant Resp. App. 156-157.

21

and such action had to be undertaken by Landlord-Center. *See* Defendant Resp. App. 159.

14.  Landlord-Center ultimately got the PD amendment on the agenda for the Planning and Zoning Commission for Dallas on September 11, 2008, and the City of Dallas eventually issued the permanent building permit for the exterior of the building on October 2, 2008. *See* Defendant Resp. App. 194.

15.  Aside from the permitting issues, Landlord-Center has also alleged (and Tenant-Base disputes) that there were delays caused by Tenant-Base's actions, particularly in getting the architectural designs, the mechanical, electrical, and plumbing ("MEP") designs, procuring furniture, fixtures, equipment, and work stoppages that occurred during the construction phase. *See* Defendant Resp. App. 157-158, 160-61.

### D.  *The Restaurant Opens and Poor Operating Results Ensue*

16.  In late November of 2008, Tenant-Base opened the interior portion of the Restaurant, while the exterior portion of the Restaurant opened on December 6, 2008. *See* Plaintiff MSJ App. 686.  From the beginning, the Restaurant underperformed, especially on Non-Event Days.[13]  *See* Plaintiff MSJ App. 956-957. For example, Landlord-Center presented uncontroverted testimony from Bill Thompson ("Mr. Thompson"), who was the general manager

---

[13] There was uncontroverted summary judgment evidence that Aranza had projected that there would be about 180 Non-Event Days during any given year.  *See* Plaintiff MSJ App. 694.

22

at the Restaurant from January 6, 2009 until it closed, that on
Non-Event Days, he was given a sales goal of $10,000 in gross
sales, and that the Restaurant would have $1,200 in gross sales
on a good Non-Event Day, but that the average Non-Event Day would
have gross sales of a mere $600. *Id.* However, on Event Days,
particularly when there were Dallas Stars and Dallas Mavericks
games, the Restaurant did what was expected and usually averaged
around $10,000 in gross sales. *Id.*

17. Unfortunately, the Event-Day sales were simply not
enough to make up for what was occurring on Non-Event Days and,
in fact, Aranza testified that, for him, alarms started going off
that the Restaurant was underperforming as soon as the end of
December 2008. *See* Plaintiff MSJ App. 704. There was
uncontroverted summary judgment evidence that the Victory Park
Development generally struggled to bring in enough traffic on
Non-Event Days to sustain restaurant and retail tenants
throughout the area, and that several other restaurants that had
previously opened around the Arena were forced to close around
the same time that the Restaurant opened. *See* Plaintiff Resp.
App. 52-55.

### E. *Parking for the Restaurant*

18. It is undisputed, that there was still not a signed
Parking Agreement by the time the Restaurant opened. It is also
undisputed that Tenant-Base never sent any demand letter to

Landlord-Center complaining about a breach of the Lease due to the lack of parking available at the Restaurant. *See* Plaintiff MSJ App. 695. Parking during Event Days was clearly not an issue—since the Lease Agreement did not obligate Landlord-Center to provide any parking for the Restaurant during Event Days at the Arena. However, where were patrons parking on Non-Event Days?

19. Courson, who was negotiating the Parking Agreement between Landlord-Center and Hillwood, testified that he ate lunch at the Restaurant 2-3 times per week. *See* Plaintiff MSJ App. 12. Courson testified that, while dining at the Restaurant, he inquired on several occasions of the general manager, Mr. Thompson, whether there were any parking issues for the Restaurant patrons on Non-Event Days. *Id.* at 12-13. Mr. Thompson's answer was always the same: there were no issues with parking *and customers were parking in Lot A*. *Id.* Moreover, Mr. Thompson also testified that when the Restaurant patrons inquired about where to park, *he also told them to park in Lot A*. *See* Plaintiff MSJ App. 957-58.

20. To be clear, Lot A is located 82 feet directly across the alley and to the west of the Restaurant and is the closest parking lot to the Restaurant. *See* Plaintiff MSJ App. 70, 665, 669. *Lot A is a free parking lot for the first two hours of use*. *See* Plaintiff MSJ App. 12. During Courson's visits to the

24

Restaurant, he testified he personally observed people park in Lot A and come into the Restaurant and never observed Lot A being full such that there were no available spaces. *Id.*

21.    Craver, who was working for Hillwood on negotiating the Parking Agreement with Courson, also testified that he had lunch at the Restaurant at least once per week. *See* Plaintiff Resp. App. 52. Moreover, Craver could even see the Restaurant from his office window at Hillwood's offices across the street from the Restaurant. *See* Plaintiff Resp. App. 51-52. Craver also testified that, on numerous occasions, he saw that patrons coming to the Restaurant during lunch would park in Lot A. *See* Plaintiff Resp. App. 52.

22.    Finally, and perhaps most importantly, there was also uncontroverted testimony from Tenant-Base's representative, Aranza, that he, too, was parking in Lot A once a week while the Restaurant was open. *See* Plaintiff MSJ App. 694-95. Moreover, Aranza could not recall a specific instance where a manager ever raised an issue with there being any problems with patrons not knowing where to park on Non-Event Days. *See* Plaintiff MSJ App. 695. In fact, Aranza testified that he was told by the managers that most of the guests that came for lunch on Non-Event Days were actually coming from the surrounding buildings and apartments and, thus, were not even parking. *Id.* Regardless of any of this, it is undisputed that the Restaurant was not able to

25

generate the traffic on Non-Event Days that it had originally projected.   *See* Plaintiff MSJ App. 703.

### F.   *Landlord-Center Declares Tenant-Base in Default Under the Lease and the Bankruptcy Filing*

23.   In an email dated May 13, 2009, Vickie Allen (on behalf of Aranza) wrote to Landlord-Center's Courson that Aranza could not continue to operate the Restaurant and asked if Landlord-Center would be available to meet to discuss a solution.   *See* Plaintiff MSJ App. 843.   However, Landlord-Center had already made the decision to declare a default under the Lease Agreement. *Id.*

24.   On May 13, 2009, Landlord-Center sent Tenant-Base a letter claiming that Tenant-Base had breached the Lease because Tenant-Base allegedly owed past-due rent from October 2008 through May 2009 in the amount of $157,666.27.   *See* Plaintiff MSJ App. 566.   This represented the "Base Rental" for the months October 2008 through May 2009.   *Id.*   In the letter, Landlord-Center also claimed that Tenant-Base had breached the Lease because Tenant-Base owed $61,666.52 to various contractors who had worked on constructing the Restaurant, and that a lien had been placed on the leased premises.[14]   *Id.*

---

[14] In fact, there were various letters submitted as part of the summary judgment evidence that support Aranza's inability to pay the contractors that had performed construction on the Restaurant.   *See* Plaintiff MSJ App. 862-65.   All of these letters state that Tenant-Base was unable to pay the respective contractor due to the fact that the project went significantly over budget and business, since the

25.  On June 4, 2009, Tenant-Base responded to Landlord-Center's allegations via letter and informed Landlord-Center that Tenant-Base disputed Landlord-Center's claims for rent and reimbursement.  *See* Plaintiff MSJ App. 610.  In that letter, Tenant-Base notified Landlord-Center that, because the Tenant-Base was unable to obtain the building permit for the Restaurant "until September, 2008 (I believe)," that it was not obligated to pay rent as soon as Landlord-Center alleged, because there were delays beyond Tenant-Base's control.  *Id.*  The letter specifically referenced Section 1.5 of the Lease Agreement, which provides that "the date on which rent begins is extended day-for-day that the Chili's opening is delayed for reasons beyond our control."  *Id.*  Moreover, Tenant-Base notified Landlord-Center that Landlord-Center was also in breach of the Lease because it had failed to obtain and provide the Parking Agreement with Hillwood.  *Id.*

26.  Interestingly, on the same exact day, Tenant-Base sent an email to one of its lenders, First United Bank, stating that the Restaurant was not profitable because "the development we expected in the area surrounding the American Airlines Center did not happen" and "since day one, the Chili's has lost money on non-event days."  *See* Plaintiff MSJ App. 898-99.  Moreover, the

---

opening of the Restaurant, had been extremely disappointing.  *Id.*
These liens were eventually paid off by Tenant-Base, however, in June
2009.  *See* Defendant Resp. App. 196.

email stated that "Gilbert is currently working with Center Operating Company to find a solution, but we cannot continue to operate the Restaurant" and that "Gilbert expects to reach an agreement with them the week of June 22nd." *Id.*

27. Clearly, an agreement was not reached between Landlord-Center and Tenant-Base, though, because, by letter dated June 25, 2009, Landlord-Center provided Tenant-Base with written notice to vacate the leased premises. *See* Plaintiff MSJ App. 14-15, 614-617. Additionally, on July 2, 2009, Landlord-Center filed eviction proceedings against Tenant-Base in the Justice of the Peace Court; however, the proceedings were halted after Tenant-Base filed for chapter 11 bankruptcy on July 6, 2009. *See* Plaintiff MSJ App. 15.

### G. *Center and Hillwood Sign the Parking Agreement and the Restaurant Closes*

28. The Restaurant continued to operate shortly after the bankruptcy filing, perhaps due to hopes of saving the venture, despite the fact that it was in the middle of the summer (rather than during the sports-busy fall and winter). *See* Defendant Resp. App. 195. In late July 2009, the Ringling Brothers Barnum & Bailey Circus (the "Circus") came to the Arena. *See* Defendant Resp. App. 197. The Circus was the first major "event" that came to the Arena since the bankruptcy filing. *Id.* During the Circus, Arena personnel apparently barricaded the south entrance

28

of the Arena.  *See* Defendant Resp. App. 162, 197.[15]  In addition,
security officers, on behalf of Landlord-Center, prohibited
Tenant-Base from handing out promotional materials/coupons during
the Circus.  *See* Defendant Resp. App. 197.  Tenant-Base alleges
that these actions were breaches of the Lease; however, no notice
was given to Landlord-Center at the time of such alleged
breaches.  *See* Plaintiff MSJ App. 685-689.

29.  Also during the pendency of the bankruptcy case,
Courson continued to communicate with Craver at Hillwood in an
effort to obtain Hillwood's signature on the Parking Agreement.
*See* Plaintiff MSJ App. 15, 618-632.  Landlord-Center and Hillwood
were ultimately able to sign an agreement on September 1, 2009
(the "New Parking Agreement").  *See* Plaintiff MSJ App. 16, 633-
646.  Among other things, the New Parking Agreement provided for
50 spaces in Lot E for the Restaurant on Non-Event Days and,
additionally (although not required under the terms of the
Lease), on Event Days at times other than between two hours
before and two hours after a sporting or entertainment event at
the Arena.  *See* Plaintiff MSJ App. 16.  However, the New Parking
Agreement was for less than one year, and was not the twenty-year
agreement as originally contemplated by the Lease.  *See* Plaintiff
MSJ App. 633-646.

---

[15] There was also evidence that the south entrance was barricaded
for the Women of Faith event on August 21, 2009 and August 22, 2009.
*Id.* at 1973

30.  Despite finalizing the New Parking Agreement, Landlord-Center was never able to deliver it to Tenant-Base.  *See* Plaintiff MSJ App. 16.  On September 3, 2009, Tenant-Base closed the Restaurant without any prior notice to Landlord-Center.  *Id*.

31.  On August 7, 2009, Landlord-Center filed the Adversary Proceeding.  Soon thereafter, Tenant-Base filed the Counterclaims.  The bankruptcy case was ultimately converted to chapter 7 on December 3, 2009, and the Bankruptcy Trustee was appointed.  Since his appointment, the Bankruptcy Trustee, through special counsel (former litigation counsel to the Debtor), has defended in the Adversary Proceeding and prosecuted the Counterclaim on behalf of Tenant-Base.

## V. SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate whenever a movant establishes that the pleadings, affidavits, and other evidence available to the court demonstrate that no genuine issue of material fact exists, and the movant is, thus, entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a); *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006*); Lockett v. Wal-Mart Stores, Inc.*, 337 F. Supp. 2d 887, 891 (E.D. Tex. 2004).  A genuine issue of material fact is present when the evidence is such that a reasonable fact finder could return a verdict for the non-movant.  *Piazza's Seafood World, LLC,* 448 F.3d at 752 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 248 (1986)). Material issues are those that could affect the outcome of the action. *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002), *cert. denied*, 537 U.S. 1188 (2003). The court must view all evidence in a light most favorable to the non-moving party. *Piazza's Seafood World, LLC,* 448 F.3d at 752; *Lockett,* 337 F. Supp. 2d at 891. Factual controversies must be resolved in favor of the non-movant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the movant satisfies its burden, the non-movant must then come forward with specific evidence to show that there is a genuine issue of fact. *Lockett,* 337 F. Supp. 2d at 891; *see also Ashe v. Corley,* 992 F.2d 540, 543 (5th Cir. 1993). The non-movant may not merely rely on conclusory allegations or the pleadings. *Lockett,* 337 F. Supp. 2d at 891. Rather, it must demonstrate specific facts identifying a genuine issue to be tried in order to avoid summary judgment. FED. R. CIV. P. 56(c)(1); *Piazza's Seafood World, LLC,* 448 F.3d at 752; *Lockett,* 337 F. Supp. 2d at 891. Thus, summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Landlord-Center has moved for summary judgment on all of

Tenant-Base's remaining counterclaims including: (1) all of Tenant-Base's fraud claims (including common law fraud in the inducement by affirmative representation, common law fraud in the inducement by non-disclosure, statutory real estate fraud, and string along fraud), (2) negligent misrepresentation, (3) breach of the Lease; and (4) request for attorney's fees.  Tenant-Base has moved for summary judgment on only two of its fraud claims, specifically:  (1) the common law fraud in the inducement claim by affirmative representation; and (2) the common law fraud in the inducement claim by non-disclosure.

**VI. RULING AND REASONS THEREFORE.**

    ***A.   Fraud Claims***

       *1.   Common Law Fraud, Common Law Fraud in the Inducement, and Statutory Real Estate Fraud*

To prevail on a fraud claim under Texas common law, a plaintiff must first prove that (1) the defendant made a false, material representation to the plaintiff; (2) when the defendant made the representation the defendant knew it was false or made the representation recklessly and without knowledge of its truth; (3) the defendant made the representation with the intent that the plaintiff act on it; (4) the plaintiff actually and justifiably relied on the representation; and (5) the representation caused the plaintiff injury.  *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex.

2001); *Shandong Yinguang Chem. Indus. Joint Stock Co., Ltd. v. Potter*, 607 F.3d 1029, 1032–33 (5th Cir. 2010).  A plaintiff's reliance on the defendant's false statement must be reasonable and justified. *Ortiz v. Collins*, 203 S.W.3d 414, 421 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

In addition to a generic common law fraud claim, Tenant-Base has brought two separate claims for common law "fraud in the inducement."  Fraudulent inducement "is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof." *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001).  It is undisputed that the alleged actions of Landlord-Center arise in the context of a contract:  here, the Lease.  The first fraud-in-the-inducement claim addresses Landlord-Center's alleged ***affirmative*** representations that it had the signed Parking Agreement with Hillwood when the Lease was signed.  The other fraud-in-the-inducement claim relates to Landlord-Center's alleged failure to disclose that it did ***not*** have the signed Parking Agreement from Hillwood when the Lease was signed.

It is black letter law that the mere failure to perform a contract will not support a claim for fraudulent inducement. *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435 (Tex. 1986); *Arete Partners, LP v. Gunnerman*, 594 F.3d 390, 394 (5th

33

Cir. 2010); *Lam v. Alpha Realtors, Inc.*, No. H-09-3041, 2010 WL
4569995, at *8 (S.D. Tex. Nov. 4, 2010); *Gimme The Best, LLC v.
Sungard Vericenter, Inc.*, No. 08-cv-2873, 2010 WL 1388993, at *3
(S.D. Tex. Apr. 1, 2010).  Rather, a promise to do an act in the
future is actionable fraud only "when made with the intention,
design and purpose of deceiving, and with no intention of
performing the act." *Spoljaric*, 708 S.W.2d at 434.  "Otherwise,
the distinction between contract and tort established by Texas
law would be virtually abolished." *Sungard*, 2010 WL 1388993, at
*4.  Fraudulent inducement also requires the plaintiff to prove
that it actually entered into a binding agreement based on the
representation.  *Hasse v. Glazner*, 62 S.W.3d 795, 798 (Tex.
2001).

As to Tenant-Base's statutory real estate fraud claims,
which apply to transactions involving real estate, the Texas
Business and Commerce Code provides a separate avenue through
which a plaintiff can recover on a theory of fraud.  Section
27.01(a) of the Texas Bus. & Comm. Code provides that a plaintiff
must prove that either (1) there was a false representation of a
past or existing material fact, made for the purpose of inducing
a person to enter into a contract, and relied on by that person
in entering into that contract, or (2) there was a false material
promise to do an act that was made with the intention of not

34

fulfilling it, for the purpose of inducing that person to enter into a contract, and relied on by that person in entering into that contract. *See* Tex. Bus. & Com. Code Ann. § 27.01(a) (West 1983). Other than the fact that statutory real estate fraud does not require proof that the defendant knew a representation was false or made it recklessly without knowledge, as a prerequisite to the recovery of actual damages, the basic elements of Texas common law fraud and statutory real estate fraud are essentially the same. *Burleson State Bank v. Plunkett*, 27 S.W.3d 605, 611 (Tex. App.—Waco 2000, pet. denied).

There are, as shown above, several common elements necessary to prove any of these above-identified fraud theories—most notably:  the requirement of a misrepresentation of "material fact"[16]; an ***intent or purpose inherent in the misrepresentation***

---

[16] A fact is material if "a reasonable person would attach importance to and would be induced to act on [it] in determining his choice of actions in the transaction in question" and there is an accompanying duty to disclose. *Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 478-79 (Tex. App.—Fort Worth 2004, no pet.); *Miller v. Kennedy & Minshew, P.C.*, 142 S.W.3d 325, 345 (Tex. App.—Fort Worth 2003, pet. denied).  Note that a duty to disclose a material fact arises in the following situations:  (1) when there is a fiduciary relationship between the parties; (2) when defendant makes a partial disclosure and conveys a false impression; (3) when defendant obtains new information that makes an earlier representation misleading or untrue; or (4) when a defendant voluntarily discloses information, the whole truth must be disclosed. *See EnviroGLAS Prods., Inc. v. EnviroGLAS Prods., LLC*, 705 F. Supp. 2d 560, 572 (N.D. Tex. 2010) (explaining that "Texas law provides" that a duty to disclose arises when "one makes a partial disclosure and conveys a false impression" as well as three other circumstances); *see also Miller*, 142 S.W.3d at 345-46; *Berry v. Indianapolis Life Ins. Co.*, 600 F. Supp. 2d 805, 820 (N.D. Tex. 2009) (stating that "Plaintiffs are correct that a duty to disclose can arise in an arms-length business

*of inducing* the plaintiff to act; and reliance on the plaintiff
by the representation.  As to the element of intent/purpose in
particular, a promise to do an act in the future is actionable
fraud only "when made with the intention, design, and purpose of
deceiving, and with no intention of performing the act."
*Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex.
1986).  While  a party's intent is determined at the time the
party made the representation, it may be inferred from the
party's subsequent acts after the representation is made.  *Id.*
"Failure to perform, standing alone, is no evidence of the
promissor's intent not to perform when the promise was made.
However, that fact is a circumstance to be considered with other
facts to establish intent." *Id.* at 435; *Arete Partners. L.P. v.
Gunnerman*, 594 F.3d 390, 394-395 (5th Cir. 2010).  The Supreme
Court of Texas has also noted that, usually, successful claims
for fraudulent inducement have involved confessions by the
defendant or its agents of the requisite intent.  *See Tony Gullo
Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305 (Tex. 2006).

Based upon the summary evidence presented, the court has
concluded that summary judgment in favor of Landlord-Center, not

---

transaction without a fiduciary or confidential relationship").  Note
also that, even "[a] representation literally true is actionable if
used to create an impression substantially false." *State Nat'l Bank
of El Paso v. Farah Mfg. Co., Inc.*, 678 S.W.2d 661, 681 (Tex. App.—El
Paso 1984, writ dism'd by agr.), *called into question on other
grounds*, *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 724 (Tex.
2001).

Tenant-Base, is appropriate as to **all** of Tenant-Base's common law fraud claims and statutory real estate fraud claims. Specifically, viewing the summary judgment evidence in the light most favorable to Base-Tenant, all of the summary judgment evidence demonstrates that:

> (a) there is no genuine issue of any material fact that exists as to the critical element of a **misrepresentation** (or even false impression) regarding the Parking Agreement;

> (b) there is no genuine issue of any material fact that exists as to the critical element of a possible intent or purpose by Landlord-Tenant to induce Base-Tenant into entering into the Lease Agreement with false statements/omissions concerning the Parking Agreement;

> (c) there is no genuine issue of any material fact that exists as to the critical element of reliance; and

> (d) perhaps, most glaring of all, there is no summary judgment evidence at all from which a reasonable fact finder could find damages to Base-Tenant caused by a lack of a Parking Agreement.

First, there is no summary judgment evidence at all that a false statement was made by Landlord-Center, to the effect that it already had the executed Parking Agreement with Hillwood on June 2, 2008—nor is there any summary judgment evidence suggesting that Landlord-Center falsely created an impression of that. Moreover, there is no summary judgment evidence that creates a genuine issue of material fact that Landlord-Center did not intend to provide Tenant-Base with the Parking Agreement and that it did not intend to perform its obligations under the

37

Lease.  In fact, there was an abundance of summary judgment evidence presented from Courson, Skenderian, and Craver showing that the Landlord-Center always intended to provide both ample parking for the Restaurant as well as the signed Parking Agreement with Hillwood.

Courson (of Landlord-Center) testified that "at the time the parties entered into the Lease and thereafter, Center intended to perform all of its obligations under the Lease, including providing the parking Agreement for Lot E." *See* Plaintiff MSJ App. 11.  This is consistent with the testimony of Craver (Hillwood's former in-house general counsel), who negotiated the Parking Agreement with Courson on behalf of Hillwood and testified as follows:

> Q.    From the time period of April 14th, 2008 that we see in Exhibit 145, to June 2nd or 3rd, 2008, do you recall having any additional communications or negotiations with Mr. Courson regarding the parking agreement for the Chili's restaurant?
> A.    I do not.
> Q.    As of approximately June 2nd or 3rd, 2008, did you continue to believe that you had reached agreement on all material terms of the parking agreement for the Chili's restaurant with Mr. Courson that's reflected in Exhibit 145 that we looked at previously?
> A.    Yes. *See* Defendant's Resp. App. 174.
>    ***
> Q.    And during that time, is it correct that you really didn't have any additional negotiations regarding the Chili's parking agreement because, as you said previously, that had—those material terms had previously agreed upon?
> A.    Yes.
> Q.    That was—that agreement was kind of just sitting

> to the side, already agreed upon, but it just
> hasn't been executed?
> A.    That's correct. *See* Plaintiff Resp. App. 47.

In order to raise a genuine issue of material fact on this issue, Tenant-Base attempts to point to evidence showing that, despite the fact that the Parking Agreement had not been formally signed by Hillwood, Courson communicated to Skenderian (whom Courson knew was working with Tenant-Base on finalizing the terms of the Lease), that the Parking Agreement had "been signed off by both Lenders attorney and Hillwood." *See* Plaintiff MSJ App. 10. Tenant-Base asserts that Courson knew that this statement would be further communicated to Tenant-Base in order to fraudulently induce Tenant-Base to sign the Lease.  However, this does not create a possible fact issue as to fraudulent inducement. Rather, the statement is consistent with all of the other summary judgment evidence that reflects an apparent belief on the part of Landlord-Center that providing the Parking Agreement to Tenant-Base (as required under the Lease) would be no problem.  All of the unrefuted summary judgment evidence shows that the delay in procuring the signed Parking Agreement from Hillwood resulted from the fact that the Parking Agreement was a small piece of an even bigger parking agreement (referred to as the Sixth Amendment) that was being negotiated between Landlord-Center and Hillwood.  In fact, there was unrefuted summary judgment evidence showing that Hillwood was not going to formally sign the Parking

39

Agreement until it had finished negotiating the terms of the
Sixth Amendment with Landlord-Center.  The unrefuted summary
judgment evidence was that Hillwood's position on this issue was
never formally communicated to Landlord-Center until **after** the
Lease Agreement had already been executed.  Specifically, it was
not until June 11, 2008, that Hillwood's position was formally
communicated to Landlord-Center:

> Q.   Mr. Craver, is it correct that prior to the time
> the parties entered into the lease, again, as of
> June 2nd of 2008, that you never personally
> communicated to Mr. Courson that Hillwood's
> signature or execution of the parking agreement
> for Chili's was conditioned on the parties
> entering into any other agreements?
> A.   I'm not sure how to answer that.  I would say
> that in our initial agreement, our initial outline
> that we got, we had a—the Chili's portion of this
> deal was part of a larger deal.  It's a small
> piece of the large transaction that involved the
> Plaza, and I felt that the agreement was
> conditioned upon there being a larger agreement on
> the Plaza also being signed, so I felt we were in
> agreement as to the Plaza—I mean, as to the
> parking on Lot E in Chili's, that we had
> negotiated that agreement and it was completed and
> put to bed.
> And we were still trying to figure out the
> agreement regarding the Plaza at the time, so I
> felt that they were tied together, so I would—I
> don't know if I ever communicated that to Craig, I
> though it was apparent from the letter of intent
> that they were together, you know, that we needed
> to have one signed or they were all going to be
> signed together, so I tried to answer your
> question.
> Q.   And is it correct that you're not aware that
> anyone else with Hillwood ever communicated that
> to Mr. Courson either—again, as of June 2nd, 2008?
> A.   I would say other than the fact that they were
> on the letter of intent, that they were listed on

the same letter of intent, I don't remember ever
communicating that to Craig or anybody from
Hillwood ever communicating that to Craig. *See*
Plaintiff Resp. App. 45.
    ***
Q.    I am going to hand you Exhibit 149.  Is Exhibit
149 a true and correct copy of a string e-mails
between you and Charles Aster at Kane, Russell,
Coleman & Logan regarding a sixth amendment?
A. Yes.
Q.    What was the sixth amendment?
A.    The sixth amendment was—the sixth amendment to
the parking agreement, it's called the Easement
and Parking Rights Agreement, that is between
various Victory entities and the American Airlines
Center regarding providing 3,000 parking spaces to
the American Airlines Center for arena parking on
Victory land and so this was a sixth amendment to
that document.
Q.    Do you know whether the sixth amendment or the—any
of the terms that were to be put in the sixth
amendment were contained in that initial
bulletpoint document in Exhibit 7?
A.    I don't recall, but I could look.
Q.    Let's go ahead and do that. Thank you.
A.    It was not included.
Q.    On the very bottom e-mail of Exhibit 149 you are
communicating to Mr. Aster, Center Operating
Company's counsel for its lender, that you had a
call with Mr. Courson; is that correct?
A.    Yes.
Q.    And can you tell me what you told him during that
call or what you discussed, and if 149 refreshes
your recollection, great.
A.    I don't remember the call with Craig, but from
this e-mail, it appears that I talked to him about
needing—Craig needed to get the Chili's parking
agreement signed and we needed to get the sixth
amendment drafted or complete in order to—in order
for us to sign the Chili's document.
Q.    So you recall—or based on this email, if we
interpret the e-mail correctly, you had
communicated to Mr. Courson on June 11th via
telephone that in order for Hillwood to sign the
Chili's parking agreement, the parties also needed
to sign the Plaza agreement and the sixth amended
agreement; is that fair?

41

> A.    Yes.
>
> Q.    As far as you know, Mr. Craver, is this the first
>       time that you'd ever communicated specifically to
>       Mr. Courson that Center Operating would need to
>       sign some other agreements in order for Hillwood
>       to sign off on the Chili's parking agreement?
>       A.    I would say other than the letter of intent,
>       which you know implies that they're tied together,
>       I—this is—this is the only communication that I'm
>       aware of that I had with Craig regarding that.
>       *See* Plaintiff Resp. App. 46.
>       ***
>
> Q.    So this would be also the first time—this would be
>       the very first time—this would be the very first
>       time in your mind that you ever communicated to
>       Mr. Courson specifically that the sixth amendment
>       signing was tied to getting Chili's restaurant
>       agreement signed?
>       A.    Right. I don't have any recollection of me
>       verbally telling them that and so this would be
>       the only communication I'm aware of regarding
>       that.  *See* Plaintiff Resp. App. 46 & 162.

The above testimony, which is unrefuted in any other evidence, is

that Courson did not have any reason to believe, before the Lease

Agreement was signed, that Landlord-Center had not reached

closure with Hillwood on Restaurant parking arrangements, or that

the Parking Agreement was in any way contingent on the Sixth

Amendment being signed.

There is also unrefuted summary judgment evidence showing

Landlord-Center's subsequent behavior after the Lease Agreement

was signed and such unrefuted behavior does not suggest anything

other than an intent to provide the Parking Agreement to Tenant-

Base.  There were multiple emails submitted into the summary

judgment record showing Courson's diligent efforts to obtain the

signed Parking Agreement from Hillwood long after the Lease was
signed. *See*  Plaintiff MSJ App. 11-16, 510-514, 562-565, 612,
618-632.  Craver confirmed Courson's efforts as well and
testified as follows:

> Q.   And subsequent to June 11th on the e-mail on 149,
>      you continued to have extensive negotiations with
>      Mr. Courson regarding the sixth amendment?
> A.   Yes.
> Q.   And those were continuous throughout the period of
>      time?
> A.   Yes.
> Q.   Was Mr. Courson diligent during that period of
>      time, in your mind, in attempting to get an
>      agreement reached on the sixth amendment?
> A.   Yes.
> Q.   And during that time, is it correct that you
>      really didn't have any additional negotiations
>      regarding the Chili's parking agreement, because,
>      as you said previously, that had—those material
>      terms had previously been agreed upon?
> A.   Yes.
> Q.   That was—that agreement was kind of just sitting
>      to the side, already agreed upon, but it just
>      hadn't been executed?
> A.   That's correct. *See* Plaintiff Resp. App. 46-
>      47.
>      ***
> Q.   As far as you could—could tell, Craig Courson was
>      being diligent in trying to get that Chili's
>      agreement signed?
> A.   Yes.
> Q.   Now, these conver—communications, you don't recall
>      the date but they did occur sometime after June
>      11, 2008, the date that's referenced in 149?
> A.   I believe so, yes. *See* Plaintiff Resp. App.
>      47.
>      ***
> Q.   So after—on or after June of '08, you do recall
>      the parties continued to work together to try to
>      get the sixth amendment done?
> A.   Yes.
> Q.   And that—that happened continuously throughout
>      these months?

43

> A.    That's right.
>
> Q.    I hand you what's been marked as Exhibit 150.  Is
> this a true and correct copy of an e-mail from
> Craig Courson to you and others, dated September
> 16, 2008, regarding parking?
> A.    Yes.
>
> Q.    And Mr. Courson is e-mailing Charles Aster and he
> says, quote, I believe we have reached consensus
> on our parking deal, period, end quote.  And then
> he goes on to describe some of the deal points
> that you and—and he had discussed; is that fair?
> A.    Yes.  Uh-huh.
>
> Q.    Okay.  At this point in September of '08 time
> frame, do you recall generally believing that
> there was a general consensus about reaching
> agreement on the parking deal?
> A.    Yes.
>
> Q.    And the parking deal that's being referred to here
> is the sixth amendment.  You weren't continuing to
> negotiate the Chili's parking agreement were you?
> A.    That's correct.  Yes.  This was only—this—we
> were not talking about the Chili's agreement at
> all in here.  We're talking about the sixth
> amendment to the parking agreement.
>
> Q.    Okay.  So based upon the status of your
> discussions and negotiations with Mr. Courson as
> of around September 16th, 2008, you believe that
> Mr. Courson was at least somewhat justified in
> believing that you had reached a consensus on the
> parking agreement?
> A.    Yes.  *See* Plaintiff Resp. App. 48; 163.

In summary, there is simply no summary judgment evidence

creating any genuine issue of material fact as to whether

Landlord-Center fraudulently intended to induce Tenant-Base to

sign the Lease.[17]

---

[17] In Paragraph 57 of the Counterclaims, Tenant-Base also made
allegations regarding a dispute between Hillwood and entities referred
to as Radical Cuban and Radical Arena regarding profit distributions
made by Landlord-Center to Radical Arena and a subsequent lawsuit
filed by Hillwood against Radical Cuban and others and that "Center
had knowledge of the Radical Cuban-Hillwood feud."  Moreover, in
Paragraph 58, Tenant-Base alleges that "Center knew that the feud

Landlord-Center is also entitled to summary judgment for another significant reason.  Perhaps more significant than the lack of summary judgment evidence suggesting misrepresentations or an intent or purpose to induce, is the utter absence of *any* evidence that Tenant-Base suffered any injury as a result of Landlord-Center's alleged misrepresentations and non-disclosures (*i.e.*, direct damages) or that a lack of parking proximately caused damages or injury to Tenant-Base (*i.e.*, consequential damages).  Specifically, the court cannot conclude that Landlord-Center's inability to promptly provide the signed Parking Agreement caused Tenant-Base any damages, *as a lack of parking—by all accounts—was not the reason that the Restaurant performed so poorly*.  Rather, the lackluster performance within the Victory Park Development (as least in 2008-2009), as well as the extremely miserable economy at the time that the Restaurant was opened, was (from all presented evidence) the cause for the Restaurant's demise.

First, it is undisputed that there was ample parking available in nearby Lot A—free for patrons of the Restaurant.  There was significant summary judgment evidence offered showing

---

between Hillwood and Radical Cuban would prevent the signing of the Hillwood Agreement."  Courson testified that these allegations are, in fact, absolutely false.  *See* Plaintiff MSJ App. 12.  Interestingly, this theory was completely abandoned by Tenant-Base and not even addressed as a genuine issue of material fact in its Partial MSJ or in its Response to the Plaintiff's MSJ.

that many (if not all) of the driving-patrons who came to the
Restaurant during Non-Event Days actually parked in Lot A.  Even
Aranza stated that he would park in Lot A when he came to visit
the Restaurant.  Moreover, there was no summary judgment evidence
presented by Tenant-Base showing that there was ever an issue
with parking at the Restaurant—in fact, all summary judgment
evidence was to the contrary.  First, Mr. Thompson, the general
manager for the Restaurant, testified as follows with regard to
Lot A:

> Q.   You did observe customers parking there?
> A.   I did observe some customers parking there.
> Q.   Okay. So when you received inquiries when you were
>      trying to market the restaurant about parking, you
>      told them, "You can park in lot A?"
> A.   I did.  *See* Plaintiff MSJ App. 957-58.
>      ***
> Q.   How did you know to tell your customers to park in
>      lot A when you had inquiries?
> A.   Why?—Because I parked there.
> Q.   Okay.  You parked there every day that you worked,
>      correct?
> A.   No, not every day.
> Q.   On nonevent days?
> A.   On occasion.
> Q.   Where else did you park?
> A.   I parked in—
> Q.   I'm going to hand you what's been marked as
>      Exhibit 6—On Page 1, does this appear to be the
>      photograph of the AAC and the surrounding parking
>      areas?
> A.   Yes.
> Q.   And you recognize that lot A here is just directly
>      across the alleyway from where the restaurant was?
> A.   Yes, I knew where lot A was, but when I would
>      park otherwise on nonevent days, I would park in
>      this lot, and I think it's F lot.
> Q.   Okay.
> A.   Is that F?

46

Q.   I believe so.
A.   Okay.
Q.   Just so we're clear, though, the lot A that you're
referring to where you told customers they could
park, is that the one that's outlined in yellow
and denoted lot A and it's directly across the
street, the alley from the restaurant, correct?
A.   Correct. *See* Plaintiff MSJ App. 958.
***
Q.   [Y]ou do recall there was a sign out there that
said its two hour free parking?
A.   There was, yeah.  *See* Plaintiff MSJ App. 959.
***
Q.   Do you know where else, if any, of the Chili's
customers parked on nonevent dates other than to
A?
A.   No—I have no idea.
Q.   You didn't personally observe any of your
customers walking up from other parking areas?
A.   I witnessed them walking through the plaza
from time to time and, actually, a lot of our
nonevent business came from the arena folks
themselves.  *See* Plaintiff MSJ App. 959.
***
Q.   On nonevent days, did you ever observe lot A as
being completely full?
A.   No.
Q.   There were always spaces available there on
nonevent days?
A.   I'm pretty certain.  *See* Plaintiff MSJ App.
960-961.

Similarly, Aranza also testified that:

Q.   Did you ever go try to do an analysis of whether
your customers had any trouble finding the
restaurant or parking for the restaurant?
A.   No, sir. *See* Plaintiff MSJ App. 682.
***
Q.   Did you ever park in Lot A during the time that
Base operated the restaurant?
A.   I parked in Lot A.
Q.   Did you park there on non-event days?
A.   I parked there on non-event days.
Q.   Did you park there on event days as well?
A.   No.
Q.   On the nonevent dates that you parked there, do

47

you recall that lot was a free lot for the first
two hours?

A.    I recall I received a ticket.  You punch a
button, you get a ticket, and you park.

Q.    But did you recall though you get the ticket, it's
a free exit if you exit within 2 hours?

A.    Yes.  *See* Plaintiff MSJ App. 694-95.
      ***

Q.    About how many times did you park in Lot A during
nonevent dates during the time that the restaurant
was opened and in operation?

A.    Maybe once a week.  *See* Plaintiff MSJ App.
695.
      ***

Q.    During the time that the restaurant was opened,
did you ever have any discussion [with] any of the
managers at the restaurant about where the
tenants—the patrons were parking or whether there
was any confusion about where they could or should
park on nonevent days?

A.    I spoke to the managers a lot about what they
knew where our guests came from, and this was
particularly at lunch.

Q.    What did they tell you?

A.    They told us they came from the surrounding
buildings or apartments.  What I could gather is
they walked there.

Q.    Okay.  That's what you expected when you put in
the restaurant that you would gather lunchtime
traffic from people who were in the neighborhood?

A.    I expected to get some walk-ins, yes.

Q.    At any time did any manager of the restaurant ever
raise the issue with there being any problems with
patrons not knowing where to park on nonevent
dates or have any trouble getting to the
restaurant due to parking?

A.    I can't recall a conversation with the
manager.

Q.    What about any other employee of the restaurant.

A.    I can't recall a conversation with them.  *See*
Plaintiff MSJ App. 695.
      ***

Q.    Mr. Aranza, as far as you know sitting here today,
there was ample parking for the Chili's Restaurant
customers parking during nonevent dates?

A.    I can't say that.

Q.    You don't know one way or the other?

48

```
          A.   You are correct.
     Q.   Any you never investigated it?
          A.   You're correct. See MSJ App. 695.
```

There was also significant summary judgment evidence regarding the lackluster development of the Victory Park area and its inability (at least in 2008-2009) to live up to its once lofty expectations, as well as summary judgment evidence that the poor economy contributed to the anemic performance of the Restaurant.  First, Craver testified about the struggles of Victory Park to retain tenants.  Specifically, Craver identified at least six (6) restaurant/food and beverage tenants (N9ne, Nove, La Condesa, the Boardroom, Paciugo, and a coffee shop) and eight (8) retail tenants that vacated Victory Park in or around the 2008 and 2009 time period.  *See* Plaintiff Resp. App. 52-55. Second, by letters dated April 6, 2009 and April 23, 2009 to various contractors who were demanding payment for work done on the construction of the Restaurant, Aranza stated as follows:

> Base Holdings, LLC simply cannot pay the balance due to [the contractor], or others, for this project due to the fact that the project was significantly over budget and business since opening the restaurant has been extremely disappointing.  ***As you might know, the restaurant business, and in particular the restaurant business around the American Airlines Center has been seriously affected by the economy.*** *See* Plaintiff MSJ App. 716-717, 863-866 (emphasis added).

Similarly, by e-mail to representatives of its lenders, dated June 4, 2009, Tenant-Base stated, in part, as follows:

49

I appreciate you working with us on this. **As Gilbert explained, the development we expected in the area surrounding the American Airlines Center did not happen and, since day one, the Chili's has lost money on non-event days.** Gilbert's affiliated company subsidized the operations there while we marketed and advertised, but it is now clear this restaurant will not be profitable.

Gilbert has been in close touch with both Brinker and the landlord, Center Operating Co.  Brinker has no interest in operating the Restaurant.   Gilbert is currently working with Center Operating Co. to find a solution, but we cannot continue to operate the restaurant . . . . *See* Plaintiff MSJ App. 856, 885, 898(emphasis added).

Moreover, Aranza also testified:

> Q.   You reiterated or you touched on this a little earlier.  I want to go back.  Why do you believe the restaurant did not achieve the level of sales that you had projected?
> A.   Well, you can see I clearly didn't get the terms [sic-should be "turns"] I projected.
> Q.   Why is it that you believe you didn't get the turns you projected?
> A.   I know it wasn't because of our quality of ops.  The Brinker folks were in that restaurant continuously and always reported back positive things about our unit.  I can't tell you.
> Q.   Well, let me refresh your recollection is what you started to talk about earlier, you talked about office buildings not going in?
> A.   The office buildings—
> Q.   The Victory development?
> A.   The office buildings weren't leased or occupied when we thought they were going to be occupied.
> Q.   What office buildings were you referring to?
> A.   The ones right there in the plaza on each side.
> Q.   It was primarily the Victory Park neighborhood that you were relying upon to drive, for example, those lunch sales you projected?
> A.   We thought we were going to get more traffic from office buildings, even on the other side of town.  There was not a name-brand full-service

casual restaurant until you got to Knox Street, the Chili's on Knox street, so we thought we would get a lot more people driving over.

Q.   You just didn't get that traffic?
A.   Don't know why we didn't get it, but didn't get it.

Q.   What else about Victory had you thought would occur that didn't occur other than the office building?  Obviously, that was significant.
A.   Several restaurants closed before we opened.

Q.   Why did they close?
A.   Don't know

Q.   Do you think it was because of the same problems you encountered later, you just didn't get the traffic down there?
A. May have been.

Q.   Did you do any research into how Victory Park was doing at the time you had made these projections before going forward?
A.   I went to Victory Park a few times during the day and at night, and didn't sense what was happening.

Q.   Is it correct to say that Victory was kind of on a downward spiral at the time you started building the restaurant?
A.   I didn't see it that way then.

Q.   But in hindsight is that what occurred?
A.   It certainly has occurred since.

Q.   Since you opened the restaurant?
A.   Yes.

Q.   You mentioned several restaurants had moved out of Victory.  Did you say before you opened the restaurant?
A.   I don't remember when they closed down.  I was disappointed to see the restaurant directly across from the Chili's closed, and the restaurant on the same side a few doors down.

Q.   What were the names of those restaurants?
A.   I don't remember.  Nine, and I don't remember the two restaurants.

Q.   Do you know if Nine closed down before you opened?
A.   I don't remember.  *See* Plaintiff MSJ App. 703-704.
***

Q.   Victory didn't drive the traffic as you'd hoped; fair to say?
A.   I don't know what didn't drive the traffic as

51

```
        I hoped.
Q.  But Victory certainly didn't?
    A.  It did not help that those restaurants closed.
    See Plaintiff MSJ App. 704.
        * * *
Q.  You weren't going to get close [to Mr. Aranza's
    sale projections], were you?
    A.  I don't think we're going to get close, but we
    didn't have the buildings occupied when we thought
    they were going to be occupied.  The buildings in
    front of the plaza were supposed to be occupied
    earlier than they actually were.  We had other
    restaurants open in the area that were going to be
    a magnet.  There were reasons why we were — why we
    could have been projecting 3 million that we
    didn't get.  See Plaintiff MSJ App. 701.
        * * *
Q.  All right.  The questions I was asking were just
    comparing net sales to your net sales projections.
    You weren't going to get close, were you?
    A.   We weren't going to hit the projections.
Q.  Those projections turned out to be materially
    overstated?
    A.   I don't know if "overstated" is the correct
    word.  I didn't do as good a job there as I did on
    almost every one of my other restaurant
    projections.
Q.  And, again, you were solely responsible for making
    the projections, the actual numbers we looked at
    earlier; correct?
    A.   Yes.  See Plaintiff MSJ App. 701.
```

In summary, there is no evidence in the record that the
failure of the Restaurant had anything to do with a lack of
parking.  Rather various other factors, including the dismal
economy and the disappointingly slow development of Victory Park,
were the obvious contributing factors.  Tenant-Base is attempting
to shift the loss of its entire investment in the Restaurant to
Landlord-Center.  The summary judgment evidence and law do not
support this, particularly where the reasons that caused the

Restaurant to ultimately fail were risks that Tenant-Base accepted knowingly and that occurred through no fault of Landlord-Center. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997). There are no facts or law presented that would allow Tenant-Base to transform Landlord-Center into an insurer of Tenant-Base's investment in the Restaurant. *Id.* In sum, there is no genuine issue of material fact suggesting that Tenant-Base may have suffered damages as a result of Landlord-Center's actions and Tenant-Base's fraud claims fail as a matter of law.

>    2.  *String Along Fraud*

Tenant-Base has also asserted a separate string-along fraud claim. Landlord-Center has first argued that "string along fraud" does not exist under Texas law. This does not appear to be accurate. In fact, string-along fraud has been held to be an ongoing course of fraud that may begin before a contract is executed or can start after the contract is entered into and continues during the course of the contract's performance. For example, in *Southwell-Gray v. Jones*, No. Civ. 300CIV1539-H, 2001 WL 493165, at *3-5 (N.D. Tex. May 4, 2001), the district court granted summary judgment for plaintiff on fraud claims based on defendants' continuing misrepresentations—both before and after the parties entered into a loan agreement—that defendants would repay a loan, even though they had no intent to do so. The court

53

recognized that the fraud claim for inducing continued performance was distinct from other types of claims, explaining that "[t]his is not merely a case of failure to perform the contract, but one in which the evidence indicates Defendants had no intention of doing so" based on "pre-Agreement representations and . . . repeated representations made during and after the term of the Agreement, regarding the status of Plaintiff's loan principal and Defendants' intention to return it." *Southwell-Gray v. Jones*, No. Civ. 300CIV1539-H, 2001 WL 493165, at *5 (N.D. Tex. May 4, 2001).

Similarly, in *Kajima Int'l, Inc. v. Formosa Plastics Corp., USA*, 15 S.W.3d 289, 293 (Tex. App.—Corpus Christi 2000, pet. denied), a defendant plant owner was liable for fraudulently inducing a contractor's continued performance under a construction contract. In *Kajima*, the court rejected defendant's argument that "by allowing recovery for fraud after execution of the contracts, every case in which breach of contract is alleged and a contracting party has asked another party for continued performance will require a fraud submission." *Id.* Rather, the court expressly recognized fraud induced after a contract is executed, stating, "[w]e can find no opinion precluding recovery for fraud because the fraud occurred after execution of a contract, and we decline to do so here." *Id.*

Other Texas federal and state courts, including the Fifth

54

Circuit, have seemingly recognized string-along or ongoing fraud

to induce continued contractual performance as a valid cause of

action that is separate and distinct from a breach of contract

claim.[18]  All of the cases cited recognize that such fraud claims

are separate and apart from other types of claims, including

claims for breach of contract.  That is because the legal duty

not to fraudulently procure performance under a contract "is

separate and independent from the duties established by the

contract itself."  *Formosa Plastics Corp. USA v. Presidio Eng'rs*

*& Contractors, Inc.*, 960 S.W.2d 41, 46-47 (Tex. 1998).

Despite the foregoing, here, the court does not find, based

on the summary judgment evidence, that there is any genuine issue

of material fact suggesting Landlord-Center perpetrated any type

---

[18]   *See, e.g., GWTP Inv., L.P. v. SES Americom, Inc.*, 497 F.3d
478, 483 (5th Cir. 2007) (reversing district court's judgment that
plaintiff's fraud claim "was just a repackaged contract claim,"
holding that defendant's misrepresentations made after the parties
entered into an unenforceable oral agreement were actionable in
fraud); *Nat'l Ctr. for Policy Analysis v. Fiscal Assocs., Inc.*, No.
CIV. A. 3:97CV2660L, 2002 WL 433038, at *5-6 (N.D. Tex. Mar. 15, 2002)
(recognizing fraud claim based on defendants' post-contract promises
of performance); *Bray Int'l, Inc. v. Computer Assocs. Int'l, Inc.*, No.
CIV H-02-0098, 2005 WL 3371875, at *6 (S.D. Tex. Dec. 12, 2005)
(recognizing validity under Texas law of string-along fraud where
defendant failed to disclose defective condition of software to induce
plaintiff to install and use the newest software version and thus to
remain defendant's customer); *McCarthy v. Wani Venture, A.S.*, 251
S.W.3d 573, 586-87 (Tex. App.—Houston [1st Dist.] 2007, pet. denied)
(affirming fraud verdict where plaintiff supplier was induced to
manufacture and deliver wallboard to nonpaying defendant distributor
based on defendant's non-disclosure of its true financial condition
and organizational structure); *Dimon v. Trendmaker, Inc.*, No.
14-96-01081-CV, 1998 WL 19861, at *8-9 (Tex. App.—Houston [14th Dist.]
Jan. 22, 1998, no writ) (not designated for publication) (reversing
summary judgment on fraud claim based on years of post-contract
misrepresentations that induced continued performance).

of string along fraud against Tenant-Base.  In addition to the same misrepresentations that Tenant-Base argues for its other fraud claims, Tenant-Base also cites to statements that Landlord-Center made after the Lease was signed in which Landlord-Center (through either Courson or Skenderian) assured and promised Tenant-Base that the Parking Agreement would be signed.  As stated above, the summary judgment evidence was utterly lacking of any hint that Landlord-Center **_fraudulently_** misrepresented or **_fraudulently_** failed to disclose, either before or after the Lease, the status of the Parking Agreement.  Moreover, the court cannot find that there is a genuine issue of fact regarding whether Tenant-Base has suffered any direct or consequential damages as a result of Landlord-Center's alleged string along fraud.  Accordingly, Tenant-Base's claim for string along fraud fails as a matter of law.

### B.  Negligent Misrepresentation Claim

The elements of the tort of negligent misrepresentation under Texas law are: (1) a defendant provided information in the course of his business, or in a transaction in which defendant had a pecuniary interest; (2) the information supplied was false; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; (4) the plaintiff justifiably relied on the information; and (5) the plaintiff

56

suffered damages proximately caused by the reliance.  *Larsen v. Carlene Langford & Assocs., Inc.*, 41 S.W.3d 245, 249-50 (Tex. App.-Waco 2001, pet. denied).[19]   Tenant-Base must show justifiable and reasonable reliance on the representations Landlord-Center made regarding the Parking Agreement.  *See Ortiz v. Collins,* 203 at 423 (justifiable and reasonable reliance is a necessary element of a claim for fraudulent misrepresentation); *Larsen*, 41 S.W.3d at 249-50 (justifiable reliance is a necessary element of a claim for negligent misrepresentation); *Solano v. Landamerica Commonwealth Title of Fort Worth, Inc.*, No. 2-07-152-CV, 2008 WL 5115294, at *9-10 (Tex. App.-Fort Worth  Dec. 4, 2008, no pet.) (affirming summary judgment where no evidence of detrimental reliance).  In the case of negligent misrepresentation: (a) the difference between the value of what the plaintiff received in the transaction and its purchase price or other value given for it; and (b) the pecuniary loss suffered by a plaintiff, in reliance on the defendant's actions, are sufficient to sustain a claim.  *Sloane*, 825 S.W.2d at 442-43 (Tex. 1991); RESTATEMENT (SECOND) OF TORTS § 552B (2011).

In its negligent misrepresentation claim, Tenant-Base

---

[19] The second prong of negligent misrepresentation has sometimes been differently phrased as "the defendant supplie[d] false information for the guidance of others in their business," and the fourth and fifth prongs have sometimes been differently phrased as "the plaintiff suffer[ed] pecuniary loss by justifiably relying on the representation."  *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991).

asserts damages based upon two representations: (1) Landlord-
Center stating that the Parking Agreement was signed; and (2)
Landlord-Center stating that the PD would not need to be amended.
Specifically, Tenant-Base refers to an email dated June 3, 2008
that Skenderian sent to Allen, as a representative of Tenant-
Base, that "[o]nce I receive the signed lease, I will obtain the
signatures on the various attachments, compile the exhibits and
send out a complete lease package."  Tenant-Base equates this to
Landlord-Center saying that the Parking Agreement was, in fact,
executed by Hillwood.

First, as to Skenderian's statement, Craver specifically
testified that:

> Q.   From the time period of April 14th, 2008 that we
>       see in Exhibit 145, to June 2nd or 3rd, 2008, do
>       you recall having any additional communications or
>       negotiations with Mr. Courson regarding the
>       parking agreement for the Chili's restaurant?
> A.    I do not.
> Q.   As of approximately June 2nd or 3rd 2008, did you
>       continue to believe that you had reached agreement
>       on all material terms of the parking agreement for
>       the Chili's restaurant with Mr. Courson that's
>       reflected in Exhibit 145 that we looked at
>       previously?
> A.    Yes.  *See* Defendant Resp. App. 174.
>       ***
> Q.   And during that time, is it correct that you
>       really didn't have any additional negotiations
>       regarding the Chili's parking agreement because,
>       as you said previously, that had—those material
>       terms had previously agreed upon?
> A.    Yes.
> Q.   That was—that agreement was kind of just sitting
>       to the side, already agreed upon, but it just
>       hadn't been executed?

A.    That's correct. *See* Plaintiff Resp. App. 47.

Thus, the unrefuted summary judgment evidence shows that Landlord-Center had, at least, a reasonable and justifiable belief that it had finalized the Parking Agreement with Hillwood at the time the Lease was executed.  Skenderian's statement to Tenant-Base indicated that he would **obtain** the signatures on the various attachments, but this is not the same thing as saying the Parking Agreement was signed.  A reasonable fact finder cannot interpret there to have been a false fact communicated to Tenant-Base as to whether Hillwood had signed the Parking Agreement. Moreover, there is unrefuted summary judgment evidence reflecting that Landlord-Center had a reasonable belief that the material terms of the Parking Agreement had been agreed to and finalized with Hillwood.  There is no summary judgment evidence from which a reasonable fact finder could infer a lack of reasonable care in suggesting a Parking Agreement would be forthcoming.

As to the PD being amended, there is no dispute that the PD ultimately had to be amended, so in fact, Landlord-Center's statement to Tenant-Base was false in this regard.  Thus, the court must determine whether or not there is a genuine issue of material fact as to whether Landlord-Center was reasonable in its belief that the PD did not need to be amended.  First, Craver testified that the determination of whether the planned development would need to be amended for the Restaurant was "very

complicated" and that he did not think that the "average person would know that" or even that the "average zoning consultant" would know because "it's not apparent from our zoning." *See* Plaintiff Resp. App. 60-61.

Second, as to the initial analysis that Landlord-Center took with regard to the PD amendment, Skenderian testified that "based on past practices and our understanding of the planned development, we believed no amendment to the planned development was required at that time." *See* Defendant Resp. App. 157. Although Landlord-Center was ultimately wrong, and the PD had to be amended, Skenderian testified that "ceratin parts of our analysis were generally accepted" but that the "city had a different interpretation" with regard to whether an amendment ultimately needed to be made. *Id.* Putting together Skenderian's and Craver's testimony, the court concludes that no genuine dispute has been shown as to whether Landlord-Center exercised reasonable care with regard to its communications to Tenant-Base on whether the PD needed to be amended. Landlord-Center clearly took the initial step of analyzing whether the PD needed to be amended, but, undoubtedly, because such process is complicated and ultimately depends on the decision making of a third party (*i.e.*, the city), the court does not think there is any fact issue created as to whether Landlord-Center was negligent in representing to Tenant-Base that an amendment to the PD was

unnecessary.

Finally, the court also concludes that there is not a genuine issue of material fact as to whether Tenant-Base's alleged damages could have been proximately caused by Landlord-Center's statements about both the Parking Agreement and the PD amendment.  Specifically, Tenant-Base has asserted damages against Landlord-Center for its construction costs of approximately $3,000,000, as well as the lost profits it expected to receive.  *See* Counterclaims, paragraph 131.  First, lost profits are not available to Tenant-Base as damages for a negligent misrepresentation claim.  *See Sloane*, 825 at 442-43; *see also Sterling Chemicals, Inc. v. Texaco, Inc.*, 259 S.W.3d 793, 797 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (finding that loss profits are not recoverable for a negligent misrepresentation claim).  Moreover, any "benefit of the bargain" or "expectancy" damages, which are the amounts necessary to put the plaintiff in as good of position as it would have been had the contract been performed, are also not recoverable under a negligent misrepresentation claim.  *See Reed v. Carecentric National, LLC, et al. (In re Soporex, Inc.)*, 446 B.R. 750, 763-764 (Bankr. N.D. Tex. Mar. 7, 2011).  This is known as the "economic loss rule," which provides that a plaintiff may not bring a negligent mispresentation claim unless the plaintiff establishes an injury that is distinct, separate, and independent

61

from the economic losses recoverable on a breach of contract claim. *See Sterling Chemicals*, 259 S.W.3d at 797. Here, all of the damages that Tenant-Base asserts under its negligent misrepresentation claim are for an economic loss or for benefit of the bargain damages to the subject matter of the Lease, and Aranza admitted as much in his deposition. Specifically, Aranza testified that:

> Q: Well, we can break it down. Negligent misrepresentation, as you see in the Counterclaim, involves the provision of false information. What false information is Base contending or does it believe supports its claims for negligent misrepresentation?
> A. Well, certainly the issues having to deal with the parking agreement, and the whole issue dealing with obtaining building permits and planned development and parking issues that surrounded the issuance of those building permits.
> Q. Can you give us facts, Mr. Aranza? Who said what and when?
> A. As I told you earlier, it is all the minutes, the weekly progress minutes who said what, when.
> Q. What specifically are you claiming is false information that gives rise to this claim for which you are seeking damages?
> A. The false information was repeatedly parking will be dealt with tomorrow. Tomorrow, tomorrow, or next week, next week.
> Q. Is there anything else you can tell us?
> A. No, sir.
> Q. How did providing such false information cause Base injury?
> A. I think I've answered that in conjunction with 1 and 2 also.
> Q. And as it relates to damages for negligent mispresentation claim, are those damages the same dealing with the subject matter of the lease that we've talked about?
> A. Yes, sir.
> Q. And what amount of damages are those? Are those

the same amounts, for example the $3.3 million
that you're claiming for breach of contract
action?
A.   It's all the amount of damages.  We're
claiming both the amount I expended and the amount
for lost profits.
Q.   So that's the 3.3 million that you're claiming for
breach of the lease, plus this unspecified amount
of lost profits you believe may be up to 10
million.
A.   Correct.
Q.   And those are damages arising out of the subject
matter of the lease.  Correct?
A.   Correct.  *See* Plaintiff MSJ App. 689-90.

Thus, having admitted that the remainder of Tenant-Base's damages

asserted under its negligent misrepresentation claim arise under

the Lease itself and are "benefit of the bargain" damages, the

court concludes that Tenant-Base has not shown any basis for

recoverable damages, as a matter of law, and, thus, summary

judgment should be granted in favor of Landlord-Center on the

negligent misrepresentation claim.

**C.  Breach of Contract**

The elements of a breach of contract claim are: (a) the

existence of a valid, enforceable contract; (b) the plaintiff is

a proper party to sue for the breach; (c) the non-breaching party

performed or tendered performance; (d) the defendant breached the

contract; and (e) the defendant's breach caused the damages

sought.  *City of the Colony v. N. Tex. Mun. Water Dist.*, 272

S.W.3d 699, 739 (Tex. App.—Fort Worth 2008, pet. dism'd).

Tenant-Base alleges six separate breaches on the part of

63

Landlord-Center in its Counterclaims: (1) failing to provide
quiet enjoyment of the premises; (2) failing to fully resolve the
parking issues; (3) failing to provide the Hillwood Parking
Agreement (4) refusing to allow Tenant-Base to advertise and pass
out handbills and coupons inside the Arena, even though the Lease
allows the same; (5) impeding the access of customers to the
Chili's Restaurant by barricading the entry way located
immediately next to the Restaurant during the Circus; and (6)
charging rent before the rental commenced on December 6, 2008.
The first alleged breach has already been addressed in the MD
Order, which specifically dismissed any claims for breaches based
upon Landlord-Center's failure to  provide quiet enjoyment of the
premises.  The remaining breaches are discussed in detail below.

> 1.    *The Closing of the South Entrance and Preventing*
>       *Disbursement of Marketing Materials*

As to the next two alleged breaches by Landlord-Center
(*i.e.*, refusing to allow Tenant-Base to hand out flyers and
coupons inside the Arena and impending access of customers to the
Restaurant by closing the south entrance of the Arena during the
Circus), the court observes that such actions were actually
permitted under the terms of the Lease.  The Rules and
Regulations regarding the Lease are contained in Exhibit "B" to
the Lease.  Section 6 of Rules and Regulations, entitled
"Marketing and Advertising" provides that "Tenant is strictly

64

prohibited from any type of marketing or advertising on property owned by Landlord without Landlord's written approval, which approval may be withheld in Landlord's sole discretion.  *See* MSJ App. 51.  It is undisputed that Tenant-Base had no such written approval and Landlord-Center only instructed Tenant-Base to refrain from marketing inside the Arena after it received a complaint from someone at the Circus.  *See* Defendant Resp. App. 162.  Thus, Landlord-Center could not have breached the Lease when it requested Tenant-Base to refrain from passing out marketing materials at the Circus.

Section 4 of the Rules and Regulations entitled "Common Areas," provided in part that "Landlord reserves the right to control and operate the public portions of the Center and the public facilities, as well as facilities furnished for the common use of the tenants, in such manner as Landlord, in its reasonable judgment, deems best for the benefit of the tenants generally." *See* MSJ App. 50.  The Arena has multiple entrances on all sides and since the Arena opened, Landlord-Center from time to time has closed some entrances during particular events held at the Arena. *See* MSJ App. 1105-1106.  These decisions are apparently made, on a case-by-case basis, for logistical reasons that include, among other things, whether such events are anticipated to have lower attendance and/or whether an event requires access to the interior space adjacent to an entrance for the staging of

65

equipment. *Id.* at 1106. For example, during the one-year period from September 1, 2008 through August 31, 2009, the main South entrances to the Arena were closed on approximately 27 dates for events. *Id.* These closures, however, did not include the separate outside entrance to the Restaurant, which entrance was located near the southwest corner of the Arena. *Id.* The Circus has been held at the Arena every summer since 2001, and the south entrances have been closed at various times over the years. *Id.* It was within Landlord-Center's decision making authority to decide whether or not it chose to keep the South entrance open and, since there is clear evidence that this is not the first time such a closure has happened, the court cannot discern any genuine issue of material fact as to whether a breach occurred due to such closures.[20]

2. *Lack of Parking Agreement*

Next, the court will turn to whether Landlord-Center's failure to provide the Parking Agreement constituted a breach of the Lease. First, it is not disputed that the Landlord-Center had an obligation to provide for parking for Chili's customers in Parking Lot E, pursuant to a referenced agreement that would be between Landlord-Center and Hillwood (the latter being the owner of Lot E). But, as a matter of contract interpretation, the

---

[20] Moreover, Tenant-Base did not present any summary judgment evidence showing that such closures were prompted by any type of ill motive towards Tenant-Base.

court does believe that Landlord-Center's failure to promptly provide the Parking Agreement (for several months; the Parking Agreement was eventually signed September 1, 2009) was a **material** breach of the Lease. However, assuming it was not a material breach, Tenant-Base's recovery on such breach would be contingent upon whether *it,* in fact, performed its obligations under the Lease, which included paying rent.

It is undisputed that Tenant-Base never paid a month of rent under the Lease. Tenant-Base, alleges, however, that it was excused from performing due to Landlord-Center's failure to provide the Parking Agreement. It is a "fundamental principle of contract law that a material breach by one contracting party excuses performance by the other party, and an immaterial breach does not." *Coastal Ref. & Mktg., Inc. v. U.S. Fid. & Guar. Co.*, 218 S.W.3d 279, 294 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). In *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 693 (Tex. 1994), the Texas Supreme Court stated that "[i]n determining the materiality of a breach, courts will consider, among other things, the extent to which the non-breaching party will be deprived of the benefit that it could have reasonably anticipated from full performance."[21] In assessing materiality

---

[21] *Hernandez* also provided that the court should consider other factors when determining materiality of a breach including: (1) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (2) the extent to which the party failing to perform or to offer to perform will

"the less the non-breaching is deprived of the expected benefit, the less the material breach." *Id.*

Again, as set above, the court cannot conclude that Landlord-Center's failure to provide the Parking Agreement was a **material** breach of the Lease. And this, likewise, means that Tenant-Base's failure to pay rent is not excused. The court will not repeat itself in citing the significant, lengthy and unequivocal testimony from Craver, Courson, Aranza, and Mr. Thompson regarding how parking was not a problem for patrons visiting the Restaurant. Rather, their testimony was consistent and unequivocal that the lack of patrons (having nothing to do with parking) caused the Restaurant's problems. Without a doubt, at the time Landlord-Center and Tenant-Base signed the Lease, it was certainly agreed that parking was necessary for the Restaurant (thereby necessitating the need for a Parking Agreement with Hillwood). Was there a breach by Landlord-Center to the extent it did not provide Parking Lot E to Tenant-Base? Yes. But, with regard to the issue of materiality, the undisputed summary judgment evidence shows that, subsequent to the Restaurant opening, patrons (including Aranza himself),

---

suffer forfeiture; (3) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; (4) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing. *Id.* at 693, n.2.

***always had a place to park***.  In fact, by all accounts, patrons
almost always parked in the much-closer Lot A.  Lot A was free to
the public for two hours during Non-Event Days.  In fact, Lot E
(for which Tenant-Base bargained) was hundreds of feet away from
the Restaurant.  Tenant-Base never once relayed to Landlord-
Center, within the roughly 10 month period the Restaurant was
open, that it had any parking concerns.

A similar situation occurred in the case of *Earl Hayes
Rents Cars& Trucks v. City of Houston*, 557 S.W.2d 316 (Tex.
App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.).  In *Earl
Hayes*, a parking facilities operator entered into a contract with
the City of Houston whereby the operator had the right to operate
parking facilities at the Houston Intercontinental Airport.  *Id.*
at 318.  As compensation to the City, the operator agreed to pay
the City a percentage of gross revenues or, alternatively,
minimum annual guaranteed payments.  *Id.*  After the airport and
parking facilities opened, the City was unable to make available
to the operator the specified number of parking spaces and to
furnish the operator with directional signs and office space as
required by the contract.  The operator expended its own funds to
construct the office space and provide signs.  *Id.*  When the City
failed to reimburse the operator for such expense, the operator
withheld payments that it owed under the contract.  *Id.* at 319-

320.    The City then evicted  the operator and operated the

parking facilities for the balance of the term of the contract.

*Id.* at 320.    The operator sued the City for breach of contract

and the City counterclaimed for breach of contract, with each

party claiming that the other owed amounts under the contract.

*Id.*    The Court of Appeals held that the City did not materially

breach the contract, stating as follows:

> There is evidence in the record from which the trial
> court could have concluded that the City's failure to
> furnish the required number of parking spaces, office
> facilities and signs was not of such a nature, under the
> circumstances,    as    to    excuse    Hayes'    [plaintiff's]
> obligation to pay the required compensation.    Not every
> breach of performance will excuse the other party from
> performance.    Where the obligations imposed upon one
> party are independent of or subsidiary to the obligations
> imposed upon the other, a breach by one party may not
> constitute such a repudiation of the contract as will
> excuse the other party from continued performance. *Id.*
> at 320.
> ***
> The City's failure to perform its obligations under the
> contract did not render performance by HAYES [plaintiff]
> impossible, and HAYES [plaintiff] continued to operate
> the facilities under the contract.    The trial court was
> justified    in    concluding    that    HAYES    [plaintiff]    had
> elected to continue the contract in effect and that the
> City's breach did not excuse HAYES' [plaintiff's] failure
> to perform.    *Id.* at 321.

Similar to the court in *Hernandez*, the court interprets the Lease

such that Tenant-Base was not excused from performing its

obligations under the Lease, when it was clearly possible to

continue operating despite the absence of the Parking Agreement.

In sum, this court cannot conclude that the alleged breach of

70

which Tenant-Base complains was material, and that, thus, Tenant-Base's performance under the Lease was excused.

   3.   *Rent*

   Finally, the court is confronted with the issue of whether Landlord-Center's decision to charge rent before the Restaurant actually opened was a breach of the Lease (Tenant-Base argues the "Chili's Opening Date" should be deemed to have been no sooner than December 6, 2008 and Landlord-Center argues that the "Chili's Opening Date" should be deemed to have occurred early in October 2008). The court concludes that there exists genuine issues of material fact as to when the Lease term actually commenced, and accordingly, the court does not grant summary judgment on this alleged breach. Specifically, Tenant-Base alleges that delays in opening the Restaurant were beyond its reasonable control. There seems to be disputed evidence regarding whether this was, in fact, the case (it appears that there may have been permitting issues, construction issues, financing issues, and even other issues at play). Additionally, as this issue is also subject to Landlord-Center's declaratory judgment relief set forth in its Complaint, the court believes it is necessary to hear full evidence on this at a trial.[22]

   ―――――――――――――――――――

      [22] The court should note that Tenant-Base, at one time, alleged that Landlord-Center's failure to provide the Parking Agreement delayed the opening of the Restaurant, specifically, because it impacted Landlord-Center's ability to procure the PD amendment. The court observes that there now seems to be no summary judgment evidence

71

**D.  Attorney's Fees**

Since a small portion of Tenant-Base's breach of contract claim has survived summary judgment, and Tenant-Base, if successful, may be able to recover attorney's fees pursuant to Tex. Civ. Prac. & Rem. Code § 38.001, summary judgment is not appropriate as to Tenant-Base's attorney's fees claim.  Thus, this claim will be decided at a future trial on Tenant-Base's remaining breach of contract claim.

**CONCLUSION**

Based on the foregoing:

A.  The bankruptcy court denies, in full, Defendant's Partial MSJ.

B. The bankruptcy court grants Plaintiff's MSJ on all of Tenant-Base's live tort counterclaims (*i.e.,* all of Tenant-Base's fraud claims and its negligence misrepresentation claim).

C.  The bankruptcy court grants Plaintiff's MSJ, in part, as to Tenant-Base's breach of contract claims.  Specifically, Landlord-Center is entitled to summary judgment on the alleged breaches asserted by Tenant-Base that Landlord-Center:  (i) failed to provide the Hillwood Parking Agreement and/or to fully

---

suggesting that the absence the Parking Agreement impacted/delayed the procurement of the PD amendment.  Not only is there no summary judgment suggesting this, but it appears that Tenant-Base no longer alleges this and it will be undisputed for purposes of the upcoming Trial.  *See* MSJ App. 650-51, 690, 878; *See also* Plaintiff Resp. App. 51.

72

resolve parking issues (such breach(es) not being material and, thus, precluding any recovery by Tenant-Base due to its nonperformance of Tenant-Base's obligation to pay rent), (ii) refused to allow Tenant-Base to advertise and pass out handbills and coupons inside the Arena, and (iii) impeded the access of customers to the Restaurant by barricade.

D. The bankruptcy court denies Plaintiff's MSJ, in part, as to Tenant-Base's breach of contract claim alleging that Landlord-Center improperly charged rent before December 6, 2008. A trial on the merits is needed regarding when the "Chili's Opening Date" should be deemed to have occurred and, thus, when Landlord-Center should be properly allowed to accrue rent.

**IT IS SO ORDERED.**

**### END OF MEMORANDUM OPINION AND ORDER ###**